## BENJAMIN NICHOLS, CONSERVATOR, *vs.* MARY ANN McCARTHY AND OTHERS.

Where a person stands in a relation of special confidence towards another and has with him some transaction from which he derives benefit, such transaction will not be sustained in equity unless it was fair in itself and its nature and effect fully understood.

And the burden of proof is on the person claiming the benefit of the transaction to show these facts.

Where a debtor understandingly and deliberately conveys away his property to hinder or defraud his creditors, a court of equity will not lend him its aid to recover it back.

But whether a party guilty of an independent fraud in receiving or retaining property upon such a conveyance should be allowed to avail himself of the fact that the conveyance to him was made to defraud creditors, as a defense against a suit to recover the property back : *Quære.* The court inclined to the opinion that such a qualification of the rule would be reasonable.

Where an old man, in feeble health, and in great agitation of mind over a suit threatened by his wife, with whom he had a controversy, and over her incurring debts in his name, and in fear that he was going to lose his property, conveyed away his property, but it was not found that he did so to evade the claims of his wife and creditors, it was held that his act was not to be regarded as done with such an intent to evade his debts that a court of equity ought to refuse its aid to recover the property back.

[Argued June 12th—decided August 28th, 1885.]

SUIT for the annulling of a mortgage and of a later conveyance of real estate, and for a reconveyance of the same, for the annulling of a bill of sale for the payment of certain money, and for the possession of the real estate; brought to the Superior Court. The following facts were found by a committee:

Martin L. Blackman, named in the complaint, was, in November, 1881, about sixty-eight years of age. He had lived in Ansonia, in New Haven County, many years, and had successfully conducted a tin shop and hardware store at that place, and was at that time possessed of real estate in Ansonia valued at $20,000, and real estate in Shelton valued at $3,000, all of which was free from incumbrance. He also had deposits in the Ansonia Savings Bank, the Derby Savings Bank, the Connecticut Savings Bank and the New Haven Savings Bank, amounting in all to about $6,100. He also had a stock of goods in his store and tin shop, household goods, horse, wagons, and choses in action, amounting in value to about $7,000. He was substantially out of debt. He had accumulated all of this property in his business.

His first wife died in December, 1880, and on the 8th day of May, 1881, he was married to Lizzie M. Foy. He was childless, and had no relatives nearer than brothers and sisters, or the issue of deceased brothers and sisters. William McCarthy is a nephew of Blackman, and Mary Ann McCarthy is his wife, and not otherwise related to Blackman. The Owens named in the complaint are children of a cousin of Blackman.

Blackman and his second wife did not live happily together, and she, on the 3d of November, 1881, brought a complaint for divorce, claiming alimony, and attached his property for $20,000. On the 4th of November Blackman wrote a letter to Hugh Dailey, the attorney bringing the complaint, proposing to make concessions for the purpose of settling the disagreement with his wife. On the 5th of November Blackman and his wife, and Dailey, as her attorney, met, when an agreement was made between Mr.

and Mrs. Blackman that the suit for divorce should be withdrawn, that they should continue to live together, and that he should execute a note and mortgage for $9,000 to Dailey, as trustee for Mrs. Blackman, payable at the death of Mr. Blackman, and should make certain other provisions for the support of the children of Mrs. Blackman by a former marriage.

Pursuant to this agreement Blackman on the 5th of November, 1881, executed and delivered to Dailey, as trustee, a note for $9,000, and a mortgage to secure the note. At the time of making this agreement and note and mortgage, Blackman did not consult with counsel, nor with any person other than his wife and her attorney, Dailey.

Within two or three days after executing the agreement, note and mortgage, Blackman, claiming that his wife was abusing him, consulted counsel with reference to disposing of his property, setting aside the note and mortgage, and instituting proceedings for divorce from his wife. At these consultations either William McCarthy or his wife, Mary Ann McCarthy, was present at the request of Blackman. McCarthy and his wife had knowledge that Blackman and his wife were not living happily, and each rendered him such assistance as they could.

After taking such counsel Blackman, on the 9th day of November, 1881, executed and delivered to Mary Ann McCarthy a trust deed of all his real and personal estate, subject to certain conditions therein expressed.

The deed conveyed two pieces of real estate, one in Shelton and the other in Derby, in New Haven County, the latter containing two dwelling houses, a barn and other buildings. After describing the real estate the deed proceeded as follows :—

" I also hereby assign, sell, transfer, and set over to the said Mary Ann McCarthy, and deliver into her hands and possession, and subject to the same conditions and trusts and for the same considerations, all my household furniture and all my goods and chattels of every name and description situated in said dwelling houses, excepting my

wearing apparel; also all my goods, chattels, horse, carriage, wagons, hay and all other goods and articles in and about said houses and barn and on said premises; also all the goods in and about my store and shop on said premises, including all my articles of merchandise, as well as all tools and implements therein. The following conditions are hereby made a part of the consideration of this instrument of conveyance:

"1st. The grantee herein shall pay to the grantor herein, during the full term of his natural life, the sum of eighty-seven dollars, on or before the last day of every month from and after the last day of this present month of November, 1881, and for the remainder of this present month the said Mary Ann McCarthy shall pay the sum of forty dollars.

"2d. The said stock of goods, household furniture, horse, carriage, and all other personal property hereby conveyed, shall at all times be kept good and full and be replaced by other articles and goods of like kind, quantity, quality and value, as far as the same may be worn out, sold or disposed of, as per inventory and value thereon now made.

"3d. The possession, use and benefit of all said personal property shall pass over from said Blackman, grantor, to said McCarthy, grantee, with the delivery of this instrument; but it is understood that the title thereto does not become absolute in the grantee until all the conditions of this instrument are fulfilled and carried out, which are to be carried out within the life time of the grantor; and that the payments of the sums of money herein specified and the trusts hereinafter named are charged upon all the property, real and personal, hereby conveyed, and are, in part, considerations of the same.

"4th. The grantor hereby reserves to himself the right to use one of the bed-rooms and a joint use of one of the parlors and sitting rooms in said house with the said grantee, but said reservation is confined and limited solely to the person of the grantor; which use is reserved during his natural life and whenever he may choose to personally occupy the same.

"5th. At my decease all the property which I have hereby conveyed shall be inventoried and appraised, and also that personal property which may have been substituted, and after all expenses have been paid incident to the execution of this trust, the said Mary Ann McCarthy shall pay over to the then living children of my adopted daughter Elizabeth Owens, late deceased, a sum of money equal to one half of said appraised valuation; and said last named trust is hereby charged upon said lands as a trust for the benefit of said children; meaning and intending that each of said children should have the use of one half of said sum so ascertained as aforesaid; and that in case of the decease of any one of them, then the children, if any, of such decedent, shall have the same share that the parent, if living, would take under this trust.

"6th. Said Mary Ann McCarthy shall keep said buildings at all times painted and in as good repair and condition as they now are, and shall also keep the same as well as said goods well insured; which insurance and policies shall be assigned to the grantor as collateral security for the performance of the trusts and conditions herein named, and she shall also keep the taxes and assessments on said lands and property paid up."

This deed was made by Blackman to Mary Ann McCarthy rather than to her husband, by direction of Blackman, and for the reason, as stated by him, that she would take better care of the property. Neither William nor Mary Ann McCarthy solicited the deed, but it was made by Blackman voluntarily after consultation with his counsel.

William and Mary Ann McCarthy accepted the deed and immediately entered into possession of the property therein conveyed, moving into the house over the store which Blackman and his wife had occupied up to this time. They ordered Mrs. Blackman to leave, which she did on the following day, and Mr. Blackman lived with McCarthy and wife pursuant to the terms of the trust deed. At about the time of the execution of the trust deed Blackman trans-

ferred the deposits in the savings banks to Mary Ann Mc-Carthy, taking deposit books in her name, but retaining possession of the books.

About the middle of November, 1881, Michael Kenney, a lawyer from Michigan, was visiting a relative in Ansonia. He met Blackman at a social gathering, when the latter introduced the subject of his troubles with his wife, and of the trust deed made by him. Subsequently he consulted with Kenney relative to the same, and employed him to assist him in settling with his wife.

Kenney, pursuant to his employment, effected an agreement between Mrs. Blackman and her trustee, Dailey, and Mr. Blackman, to the effect that Blackman should pay his wife $5,000, that she should surrender the $9,000 note and mortgage, and should proceed to obtain a divorce from him, and that she should make no further claim for alimony or for any interest in his estate. Pursuant to this agreement Blackman placed in the hands of Kenney the savings bank books standing in the name of Mrs. McCarthy, on which there was due $6,100, to draw the money from the banks, and to complete the settlement with his wife upon the terms agreed upon. Mrs. McCarthy went with Kenney to the several banks, drew the money due on the books, and gave it to Kenney, and he out of this money paid the $5000 to Dailey as trustee for Mrs. Blackman, and Dailey, as such trustee and as attorney for Mrs. Blackman, quitclaimed to Mrs. McCarthy the mortgage of $9,000, and gave up the note secured by it. The date of this quit-claim deed was November 18th, 1881. Mrs. Blackman did thereupon, on the same day, bring another complaint for divorce to the Superior Court for New Haven County, alleging for cause intolerable cruelty, which divorce was granted the petitioner by the court April 18th, 1882.

On the 17th of November, 1881, Blackman executed and delivered to Mrs. McCarthy a warranty deed of the same real estate described in the trust deed of November 9th. On the 19th of November, 1881, he executed and delivered to her a bill of sale of the goods and material in the store

and tin shop, the horse, carriage and all choses in action arising out of sales of goods in the store.

At the time of the execution and delivery of the warranty deed and bill of sale there had been no release of the trust deed of November 9th, 1881, and no release of the mortgage of $9,000, other than the assignment of the same to Mrs. McCarthy, nor has there since that time been any such release.

At the time of the execution of the trust deed of November 9th, 1881, William and Mary Ann McCarthy had no property, nor have they since acquired any property other than what has been conveyed to them by Blackman. They paid no consideration to Blackman for the property described in the trust deed, warranty deed and bill of sale, nor for the savings bank deposits that were transferred to Mrs. McCarthy, nor did they or either of them make any agreement to support Blackman as is specified in the warranty deed, nor to perform the conditions of the trust deed, except what might be implied by their acceptance of the deeds.

After William and Mary Ann McCarthy entered into possession of the property under the trust deed, they occupied the tenement over the store, and Blackman has lived with them from that time to this, and they have supported and cared for him in a suitable manner.

The business of the store and tin shop from the time of the giving of the trust deed down to the time this suit was commenced, was conducted in the usual manner by Blackman, except that the business was done by him as agent for Mary Ann McCarthy. The business of the store was for the most part managed by Blackman. William McCarthy worked in the tin shop and Mrs. McCarthy rendered some assistance in the store. The receipts from the store and tin shop and the rents from tenements on the property were paid to Blackman, and he, after paying the family expenses of the McCarthys and himself, and the expenses of the business, turned over the remainder to Mrs. McCarthy, and she, by advice of Blackman, deposited the same in her

name in the Derby Savings Bank. The amount so deposited by her was $1,500. She drew the same from the savings bank before the process in this suit was served on the bank, so that at the time of service of such process there was no deposit to her credit in the bank nor anything due her from the bank.

The $87 a month specified in the trust deed of November 9th, to be paid to Blackman, was never paid to him, nor was the same ever demanded by him.

At the time of these transfers in November, 1881, Blackman was in a feeble physical condition, he was miserly and penurious, his wife had contracted debts in his name and without his knowledge, and after she had been driven from his house she was threatening suit for support. These things, together with the complaint for divorce and attachment for alimony, greatly excited him, and he was in great fear that he was going to lose his property. During all this time, however, he managed the business of his store and tin shop in his usual manner, and continued to so manage it down to the time of the bringing of this suit. From the foregoing facts I find that Blackman at that time had sufficient mental capacity to transact business, and that he understood the business that he was doing.

The trust deed of November 9th, the warranty deed of November 17th, the bill of sale of November 19th, the transfer of the savings bank deposits, the settlement with his wife and the agreement for divorce, were all made and done by Blackman voluntarily and without importunity from any one.

All the allegations of fraud and conspiracy between Mrs. Blackman, Michael Kenney, William McCarthy and Mrs. McCarthy, to procure from Blackman his property, I find not proved and therefore not true.

Blackman has no property other than such interest as he may have in the property hereinbefore described.

Upon the application of the selectmen of the town of Derby the court of probate for the district of Derby appointed the plaintiff conservator of Mr. Blackman, on the 6th day of August, 1883.

The plaintiff filed a remonstrance against the acceptance of the report, which the court (*Andrews, J.,*) overruled, accepted the report, and rendered judgment therein in favor of the defendants. The plaintiff appealed.

*W. H. Williams* and *E. B. Gager*, for the appellant.

1. The conveyance and bill of sale to Mary Ann McCarthy were invalid from want of sufficient mental capacity on the part of Blackman. It is found that he had mental capacity " to transact business " and that he " understood the business he was doing." If this was all it was not sufficient. *Hale* v. *Hills*, 8 Conn., 43 ; *Taylor* v. *Atwood*, 47 id., 498 ; *Hovey* v. *Chase*, 52 Maine, 304 ; *Dennett* v. *Dennett*, 44 N. Hamp., 531 ; *Young* v. *Stevens*, 48 id., 133 ; Pomeroy's Eq. Jur., § 947 and note 1.

2. They were invalidated by fraud and undue influence. An unconscionable advantage was taken of him as a feeble old man under great excitement and fear. " It is no objection that the committee do not expressly find fraud, but only certain facts from which the law may infer fraud, or we should rather say, facts from which the law justly assumes a wrong to have been done, facts which show that the deed in question was obtained under circumstances which in *conscience* and *good faith* require it to be set aside." *Lavette* v. *Sage*, 29 Conn., 589. Fraud is " a legal conclusion to be derived or inferred by the court from established facts." *Story* v. *Norwich & Worcester R. R. Co.*, 24 Conn., 113. See also *Beers* v. *Botsford*, 13 Conn., 154; *Pettibone* v. *Stevens*, 15 id., 26 ; *Miller* v. *Welles*, 23 id., 32 ; *Taylor* v. *Atwood*, 47 id., 498.

3. A court of equity will set aside any conveyance made by a person in a position of weakness or dependence, to one who stands to him in a relation of confidence and trust, unless the transaction be perfectly fair and entered into by the former with a full understanding of the facts. This transaction was between trustee and *cestui que trust*, and it was the duty of Mrs. McCarthy and her husband, standing in a " position of superiority " over the feeble old man, to

see to it that no inequitable or unconscionable advantage was taken of him, much more not to take or retain such advantage themselves. And the burden of proof rests on them to show that the transaction was a fair one and perfectly understood by Mr. Blackman. 2 Pomeroy Eq. Jur., §§ 955 to 958, and notes; *Gillespie* v. *Holland*, 40 Ark., 28. The law assumes in such a case that the parties were unequal and will not tolerate any advantage taken of the opportunity. *Hatch* v. *Hatch*, 9 Ves., 295; *Huguenin* v. *Baseley*, 14 id., 273; *Cooke* v. *Lamotte*, 15 Beav., 234; *Clark* v. *Malpas*, 31 id., 80; *Hamilton* v. *Wright*, 9 Clark & Fin., 111; *Williams* v. *Stevens*, 30 Jur., 952; *Aberdeen Railway Co.* v. *Blaikie*, 1 Macqueen's H. L. Cas., 461; *Tate* v. *Williamson*, L. R., 2 Cha. App., 61; 3 Lead. Cas. in Eq. (H. & W. notes) 112, 120; *Hemingway* v. *Coleman*, 49 Conn., 392; *Nesbit* v. *Lockman*, 34 N. York, 169; *Cowee* v. *Cornell*, 75 id., 100; *Wheelan* v. *Wheelan*, 3 Cowen, 537; *Brice* v. *Brice*, 5 Barb., 533; *Tracey* v. *Sacket*, 1 Ohio St., 58; *Emery* v. *Parrott*, 107 Mass., 100; *Shipman* v. *Furness*, 69 Ala., 555; 1 Story Eq. Jur., §§ 321, 322 and notes. If Mrs. McCarthy received these transfers innocently, but infected with the fraud of either Mrs. Blackman or Kenney, the obligation of restitution follows it into her hands; and she cannot avail herself of her own innocence to protect the property against the party who has been deprived of it by fraud or imposition. *Whelan* v. *Whelan*, 3 Cowen, 573; *Brice* v. *Brice*, 3 Barb., 533; *Gardner* v. *Mangam*, 93 N. York, 643; *Krumm* v. *Beach*, 96 id., 404.

4. The conveyances were not made to defraud or hinder creditors. It is not found that they were so made, and the facts found do not warrant that conclusion. And if they were so made these defendants would not be allowed to avail themselves of that fact to sustain themselves in fraudulently keeping the property.

*W. C. Case* and *T. J. Fox*, for the appellees.

1. In the absence of mental incapacity on the part of the grantor or fraud on the part of the grantee, the convey-

ances in question will not be set aside. " A voluntary deed, free from any imputation of fraud, surprise or undue influence, spontaneously executed by a person with his eyes open, cannot be set aside in a court of equity." 2 Swift Dig., 70. " A voluntary settlement, completely executed without any circumstances tending to show mental incapacity, mistake, fraud or undue influence, is binding, and will be enforced against the settlor and his representatives, and cannot be revoked except so far as a power of revocation has been reserved in the deed of settlement." *Falk* v. *Turner*, 101 Mass., 494; *Viney* v. *Abbott*, 109 id., 302.

2. Blackman was not mentally incapacitated. He had always managed his own business and so managed it as to accumulate the property which occasions this controversy. He continued to control it in the usual manner, after the first deed had been given, down to the date of this suit. It is expressly found that he had, at the time of executing these conveyances, "sufficient mental capacity to transact business and understand the business he was doing." " Old age is not a sufficient ground to presume imposition so as to justify setting aside a contract." 2 Swift Dig., 75. Nor physical weakness. *McKinney* v. *Hensley*, 74 Misso., 326. The finding that he was of " sufficient mental capacity, and understood the business," is conclusive as to this reason.

3. He was under no undue influence. " Neither William nor Mary Ann McCarthy solicited this deed, but the same was made by Blackman voluntarily, after consultation with his counsel." " The trust deed of November 9th, the warranty deed of November 17th, the bill of sale of November 19th, the transfer of the savings bank deposits, the settlement with his wife, and the agreement for divorce, were all made and done by Blackman voluntarily and without importunity from any one." The McCarthys were not volunteers. They were called upon by Blackman to assist him, and all they or either of them ever did was at the express request of Blackman. So far from influencing him, they never even advised him.

4. These conveyances were not procured by fraud and

conspiracy. The facts found sufficiently show this, but to put the matter beyond all question, the committee expressly finds that " all allegations of fraud and conspiracy to procure from Blackman his property, I find not proved, and therefore not true."

5. The transactions on their face do not commend Blackman to a court of equity as a meritorious sufferer entitled to relief from the consequence of his own acts. The nature of the acts and contracts does not justify the conclusion that Blackman did not exercise his deliberate judgment, and that he was imposed upon or overcome by cunning, artifice, or undue influence. *Taylor* v. *Atwood*, 47 Conn., 498. That an old man, fearing upon good grounds that he will lose his property, should convey it away to the natural objects of his bounty—those who would inherit it at his death—stipulating for his own support during the remaining years of his life, (and this is the plaintiff's whole case as disclosed by the report,) is not upon its face an inequitable, unconscionable transaction calling for equitable relief. The court will not interfere for inadequacy of price, (an element which we do not admit exists here.) " Such persons," (that is, persons capable of contracting), " may sell their property for less than its value, or give it away. And the law must either regard such contracts as having been made knowingly and purposely, and therefore not to be escaped from as thus intentionally made, or assume the right to modify every contract; which would be intolerable." *Hemingway* v. *Coleman*, 49 Conn., 393.

6. The only other reason for invoking the aid of a court of equity against these conveyances is the claim that the McCarthys have failed to perform the conditions. But here again the report of the committee is explicit and conclusive. Blackman has not only received his support from the McCarthys, but has retained control of the property, and remained practically its owner. A court of equity will not lend its aid to enforce a forfeiture of a deed for non-performance of its conditions. *Beecher* v. *Beecher*, 43 Conn., 561. But, it is said, he has not received the $87 per

month, stipulated for by the first trust deed, and that he ought to have judgment therefor. But as a matter of fact he has received from Mrs. McCarthy far more than the sum claimed—having received the entire proceeds of the real estate, of the tin business, and of the labor and services of the McCarthys, in the shop, store and house.

7. The conveyances were prompted by a desire to save the property from the attacks of creditors, either real or imaginary, and valid therefore between the parties. *Chapin* v. *Pease*, 10 Conn., 72; *Freelove* v. *Cole*, 41 Barb., 318; *Dunaway* v. *Robertson*, 95 Ill., 425; *Smith* v. *Hubbs*, 10 Maine, 71; *Etter* v. *Anderson*, 84 Ind., 337; *York* v. *Merritt*, 80 N. Car., 290; *Ford's Exrs.* v. *Lewis*, 10 B. Monr., 127. "It is a settled principle of law that the grantor in a deed made for the purpose of defrauding, hindering or delaying his creditors cannot be relieved against its operation. As to him it is valid." *Ybarra* v. *Lorenzana*, 53 Cal., 199.

STODDARD, J. At the time of the transfers in question in November, 1881, the grantor and donor, Martin L. Blackman, was about sixty-eight years of age, and during his life had accumulated in a small tin shop and hardware business property valued at about $36,000, of which $20,000 was in real estate, and $3,000 deposited in savings banks, the remainder being his stock in trade and appliances for carrying on his business. He was childless. His first wife had died in December, 1880, and on the 8th of May, 1881, he married again, and on the 3d of November, in the same year, his wife instituted proceedings for a divorce, claiming alimony, and attached his property for $20,000. He made an arrangement with his wife's attorney by which he gave to the attorney, as trustee for his wife, a note for $9,000, secured by mortgage upon his real estate, and payable at his death. He was at this time, it is found, "in a feeble physical condition; he was miserly and penurious; his wife had contracted debts in his name, and without his knowledge," and was threatening suit for support. "These things, together with the complaint for divorce and attach-

ment for alimony, greatly excited him, and he was in great fear that he was going to lose his property."

William McCarthy is a nephew of Blackman, and Mary Ann McCarthy is the wife of William. Said William, and especially Mary Ann, appear to have largely enjoyed the confidence of Blackman, and, excepting his counsel, they are the only persons with whom he consulted.

Blackman claiming that his arrangement with his wife had failed in its purpose, at his request William and Mary Ann went with him to consult counsel with reference "to disposing of his property, setting aside said note and mortgage of $9,000, and instituting proceedings for a divorce from his wife," and William and Mary Ann "each rendered him such assistance as they could," and appear to have been fully advised as to his wishes and purposes.

As the result of such conferences with counsel on the 9th day of November, 1881, Blackman executed and delivered to Mary Ann a trust deed of all his real and personal estate. This deed was accepted by William and Mary Ann McCarthy, and by the terms of the deed Mary Ann became a trustee, and Blackman a beneficiary of the trust. The deed is expressed to be in consideration "of the conditions and trusts hereinafter recited." It is drawn with deliberate care, with full appreciation of the circumstances and conditions relating to the present and future life of the grantor, the amount and situation of his property, and the persons whom he desired to make objects of his bounty. The conditions of the deed provide for a monthly payment by the grantee to the grantor of the sum of $87, that the amount and condition of the personal property conveyed shall be kept good by the grantee, and that the title to the personal property should not become absolute in the grantee until all the conditions of the deed were complied with. The money payments and trusts named in the deed are charged upon all the property conveyed.

The grantor reserved to his own personal life use some portion of the real estate, and by the fifth clause he provides that at his death one half of the appraised value of

his estate shall be paid over to the then living children of his adopted daughter, and then he charges this last named trust upon the lands.

By the sixth clause he provides that the grantee shall keep the buildings at all times painted and in as good repair and condition as they now are, that she shall keep them insured, and that the insurance shall be assigned to the grantor as collateral security for the performance of the trusts and conditions therein named, and that she shall also keep the taxes and assessments on the lands and property paid up. And then, at the conclusion of the deed, superadded to all these repeated attempts to charge and bind the property to the performance of these trusts and conditions, the grantor further provided as follows:—

"But to this deed there is this additional condition, viz.:—If the grantee shall fail and neglect to fulfill any of the conditions of this deed specified above to be performed in the life time of the grantor, and he should decide to avail himself of such breach by giving notice thereof to the grantee, then this deed shall become void; otherwise, to remain in full force forever."

Under the facts stated in the finding of the committee and the provisions of this deed Mary Ann McCarthy was a trustee and Blackman a *cestui que trust* of the rights and interests reserved to and provided for Blackman in and by the deed. She and her husband, by their own volition, occupied confidential relations as to the disposition of his whole property, and were giving him, and he receiving from them, aid and advice respecting the same, and from their personal and family relations a state of personal confidence existed.

This being the state of affairs on the 9th of November, 1881, on the 17th day of the same month Blackman executed and delivered to Mary Ann a warranty deed of all his real estate, and on the 19th he executed and delivered to her a bill of sale of all his personal property. These conveyances were without consideration and are claimed as gifts.

Before commenting upon the peculiar features of these last conveyances it will be well to refer to some of the doctrines that govern cases wherein voluntary dispositions of property have been claimed by the trustee against the beneficiary in the trust, and the rules that guide and control courts of equity as to gifts by persons in confidential, advisory and fiduciary relations.

In the tenth edition of Story's Equity Jurisprudence, vol. 1, § 307, this language is held:—"Let us, in the next place, pass to the consideration of the second head of constructive frauds; namely, of those which arise from some peculiar confidential or fiduciary relation between the parties. In this class of cases there is often to be found some intermixture of deceit, imposition, overreaching, unconscionable advantage, or other mark of direct and positive fraud. But the principle on which courts of equity act in regard thereto stands, independent of any such ingredient, upon a motive of general public policy, and it is designed, in some degree, as a protection to the parties against the effects of overweening confidence and self-delusion and the infirmities of hasty and precipitate judgment." And after commenting upon the relation of parent and child, attorney and client, guardian and ward, the author proceeds in section 321 as follows:—"In the next place, with regard to the relation of trustee and *cestui que trust* or rather beneficiary. In this class of cases the 'same principles govern as in cases of guardian and ward, with at least as much enlarged liberality of application and upon grounds quite as comprehensive. Indeed, the cases are usually treated as if they were identical. A trustee is never permitted to partake of the bounty of the party for whom he acts, except under circumstances which would make the same valid if it were a case of guardianship." And in section 319 the author quotes approvingly the language of Lord ELDON. "There may not be (says he) a more moral act, one that would do more credit to a young man beginning the world or afford a better omen for the future, than if, a trustee having done his duty, the *cestui que trust*, taking the matter into his

fair, serious and well-informed consideration, were to do an act of bounty like this. But the court cannot permit it, unless quite satisfied that the act is of that nature, for the reason often given; and recollecting that, in discussing whether it is an act of rational consideration, an act of pure volition uninfluenced, that inquiry is so easily baffled in a court of justice, that instead of the spontaneous act of a friend uninfluenced, it may be the impulse of a mind misled by undue kindness, or forced by oppression; and the difficulty of getting property out of the hands of the guardian or trustee thus increased. And, therefore, if the court does not watch these transactions with a jealousy almost invincible, in a great majority of cases it will lend its assistance to fraud, where the connection is not dissolved, the account not settled, everything remaining pressing upon the mind of the party under the care of the guardian or trustee."

And in section 311 it is stated that the incapacity of a trustee to purchase of his beneficiary is so absolute that the *cestui que trust* may set aside the transaction at his own option.

In the second volume of Pomeroy's Equity Jurisprudence, section 955, it is said:—" The single circumstance now to be considered is the existence of some fiduciary relation, some relation of confidence subsisting between two parties. No mental weakness, old age, ignorance, pecuniary distress, and the like, is assumed as an element of the transaction." And in section 957 :—" There are two classes of cases to be considered which are somewhat different in their external forms, and are governed by different special rules, and which still depend upon the single general principle. The first class includes all those instances in which the two parties consciously and intentionally deal and negotiate with each other, each knowingly taking a part in the transaction, and there results from their dealings some conveyance, or contract, or gift. To such cases the principle literally and directly applies. The transaction is not necessarily voidable, it may be valid; but a presumption of its invalidity arises, which can only be overcome, if at all, by

clear evidence of good faith, of full knowledge, and of inde-
pendent consent and action. * * * The transactions be-
longing to the first class may be gifts, or agreements and
conveyances upon valuable consideration. The principle is
applied with great emphasis and rigor to gifts, whether
they are simple bounties or purport to be the effects of liber-
ality based upon antecedent favors and obligations." And
applying the general dictum to the particular case of trustee
and beneficiary in section 958:—"In the second place,
where the trustee deals, with respect to the trust, directly
with his beneficiary. A purchase by a trustee from his
*cestui que trust*, even for a fair price and without any undue
advantage, or any other transaction between them by which
the trustee obtains a benefit, is generally voidable, and will
be set aside on behalf of the beneficiary; it is at least *primâ
facie* voidable upon the mere facts thus stated. There is,
however, no imperative rule of equity that a transaction
between the parties is necessarily, in every instance, void-
able. It is possible for the trustee to overcome the pre-
sumption of invalidity. If the trustee can show, by unim-
peachable and convincing evidence, that the beneficiary,
being *sui juris*, had full information and complete under-
standing of all the facts concerning the property, and the
transaction itself, and the person with whom he was deal-
ing, and gave a perfectly free consent, and that the price
paid was fair and adequate, and that he made to the bene-
ficiary a perfectly honest and complete disclosure of all the
knowledge or information concerning the property possessed
by himself, or which he might with reasonable diligence
have possessed, and that he has obtained no undue or in-
equitable advantage, and especially if it appears that the
beneficiary acted in the transaction upon the independent
information and advice of some intelligent third person
competent to give such advice, then the transaction will be
sustained by a court of equity. The doctrine is enforced
with the utmost stringency when the transaction is in the
nature of a bounty conferred upon the trustee, a gift or
benefit without full consideration. Such a transaction will

not be sustained unless the trust relation was for the time being completely suspended, and the beneficiary acted throughout upon independent advice and upon the fullest information and knowledge."

In Perry on Trusts, vol. 1, § 168, the general rule is stated thus:—" Constructive trusts may be divided into three classes, to be determined according to the circumstances under which they arise. First, trusts that arise from actual fraud practised by one man upon another. Second, trusts that arise from constructive fraud. In this second class the conduct may not be actually tainted with moral fraud or evil intention, but it may be contrary to some rule established by public policy for the protection of society. Thus, a purchase made by a guardian of his ward, or by a trustee of his *cestui que trust*, or by an attorney of his client, may be in good faith, and as beneficial to all parties as any other transaction in life ; and yet the inconvenience and danger of allowing contracts to be entered into by parties holding such relations to each other are so great that courts of equity construe such contracts *primâ facie* to be fraudulent, and they construe a trust to arise from them."

In section 194:—" At law, fraud must be proved; but in equity there are certain rules prohibiting parties, bearing certain relations to each other, from contracting between themselves; and if parties bearing such relations enter into contracts with each other, courts of equity presume them to be fraudulent, and convert the fraudulent party into a trustee. And herein courts of equity go further than courts of law, and presume fraud in cases where a court of law would require it to be proved; that is, if parties within the prohibited relations or conditions contract between themselves, courts of equity will avoid the contract altogether without proof, or they will throw upon the party standing in this position of trust, confidence and influence, the burden of proving the entire fairness of the transaction. Thus, if a parent buys property of his child, a guardian of his ward, a trustee of his *cestui que trust*, an attorney of his

client, or an agent of his principal, equity will either avoid the contract altogether without proof, or it will throw the burden of proving the fairness of the transaction upon the purchaser; and, if the proof fails, the contract will be avoided, or the purchaser will be construed to be a trustee at the election of the other party. The ground of this rule is, that the danger of allowing persons holding such relations of trust and influence with others to deal with them is so great that the presumption ought to be against the transaction, and the person holding the trust or influence ought to be required to vindicate it from all fraud, or to continue to hold the property in trust for the benefit of the ward, *cestui que trust*, or other person holding a similar relation."

In section 195:—" These principles are applied in their full vigor to all contracts and sales between trustee and *cestui que trust*. The trustee is in such a position of confidence and influence over the *cestui que trust* that the contract or bargain will either be void or he will be a constructive trustee, at the election of the *cestui que trust*, unless the trustee can show that the contract was entirely fair and advantageous to the *cestui que trust*. The general rule is, that the trustee shall not take beneficially by gift or purchase from the *cestui que trust*, even although the supposed trustee and purchaser is a mere intermeddler and not a regularly recognized trustee." In section 197 the author declares that "it is thus seen that the rule against purchasing by trustees amounts almost to prohibition."

The decided cases support these doctrines of equity stated by text writers to the fullest extent, and in all cases where a contract or gift is claimed adversely to the beneficiary in the trust relation, as *cestui que trust*, client, ward; &c., courts of equity not only require of the trustee, attorney, guardian, &c., the most ample and convincing proofs of the entire fairness of the transaction, and possession of full information, knowledge and intentional action on the part of the beneficiary, after competent and independent advice and deliberate consideration, but courts also set

aside such contracts and gifts with great freedom, either as void from their intrinsic nature, or voidable because of the absence of the required proofs of full consideration, deliberate action, independent, intelligent and competent advice, rational design, &c. The action, gift, contract, &c., must not only be intentional and with knowledge enough on the part of the beneficiary to care for his ordinary affairs, but such intentional act and knowledge must be characterized by these other elements in its composition.

This presumption of inequality in dealing, and the casting of this burden of proof upon the *cestui que trust*, guardian, attorney, &c., arises from the trust relation itself. *Cowee* v. *Cornell et al.*, 75 N. York, 100. In *Curran* v. *Belmontly*, 3 H. L. Cas., 742, a contract was set aside because it was "improvident, and hastily carried into execution." And see remarks of Lord Justice TURNER in *Baker* v. *Monk*, 4 De Gex, Jones & Smith, 392. In *Morgan* v. *Minett*, L. R., 6 Ch. Div., 648, a gift by client to solicitor was set aside, and BACON, V. C., said that the rule absolutely prohibited such gifts. This may be a somewhat stronger statement of the rule than prevails in other jurisdictions. But the settled doctrines of equity make it almost impossible that such a gift can prevail.

The case of *Savey* v. *King*, 5 H. L. Cas., 655, (CRANWORTH, L. C.), was of a gift by a son after arriving at full age to his father. The father was required "to justify what has been done; to show, at all events, that the son was really a free agent, that he had adequate independent advice, that he was not taking an imprudent step under parental influence, and that he perfectly understood the nature and extent of the sacrifice he was making, and that he was desirous of making it."

In *Rhodes* v. *Bate*, 1 Ch. App. Cases, 257, the language of the court is:—"I take it to be a well-established principle of this court that persons standing in a confidential relation towards others, cannot entitle themselves to hold benefits which those others may have conferred upon them, unless they can show to the satisfaction of the court that

the persons by whom the benefits have been conferred had competent and independent advice in conferring them. This, in my opinion, is a settled 'general principle of the court, and I do not think that either the age or capacity of the person conferring the benefit, or the nature of the benefit conferred, affects this principle. Age and capacity are considerations which may be of great importance in cases in which the principle does not apply ; but I think they are but of little if any importance in cases to which the principle is applicable. They may afford a sufficient protection in ordinary cases, but they can afford but little protection in cases of influence founded upon confidence."

The case of *Archer* v. *Hudson*, 7 Beavan, 560, was of a gift by a niece, who had just come of age, to her uncle, who was regarded as standing *in loco parentis*. It is there said that the court "will take care (under the circumstances in which the parent and child are placed before the emancipation of the child) that such child is placed in such a position as will enable him to form an entirely free and unfettered judgment, independent of any sort of control." See also *Maitland* v. *Backhouse*, 16 Sim., 58.

The case of *Anderson* v. *Elsworth*, 3 Giff., 154, illustrates the extent and rigor of application of the doctrine in England. A voluntary deed made by a woman "of about seventy years of age and not incompetent, was set aside after her death for the reason that the deed was improvident, and because it did not appear affirmatively that she understood the whole nature and effect of the deed. This decree was made after the death of the grantor and in favor of volunteers, and although the court found 'that Elizabeth Marston (the grantor) certainly had a distinct intention to give her property to Mary Elsworth, who takes it by this deed to the exclusion of all other persons.' "

In all these classes of cases when such contracts and gifts are set aside, it is assumed that the intent to make them exists. But the question is not "whether she knew what she was doing, had done, or proposed to do, but how the intention was produced." Lord ELDON in *Huguenin* v.

*Boseley*, 14 Ves., 300. *Primâ facie* a purchase by a trustee from his *cestui que trust* cannot stand. *Spencer's Appeal*, 80 Penn. St., 332; *Smith, Exr.* v. *Townshend*, 27 Md., 368. In cases of contract between attorney and client it is said in *Dunn* v. *Record*, 63 Maine, 19, adopting the language of Judge STORY:—"The burden is upon the purchaser and not upon the client to establish the perfect fairness, adequacy, and equity of the transaction." The transaction must be fair and equitable, and the client must be fully informed of the nature and effect of the contract, sale, gift, &c. *Kisling* v. *Shaw*, 33 Cal., 440.

The books are full of cases holding substantially the same language.

Can the deed of November 17th and the bill of sale of the 19th be vindicated, tested by these rules?

These conveyances, regarded as they evidently were as one transaction, were a voluntary conveyance of all the grantor's property to another. It is said in *Anderson* v. *Elsworth*, 3 Giff., 169:—"Nothing could be more improvident than for a woman at her time of life to dispose of the whole of her property so as to leave for herself nothing. No doubt the gift was to a person with whom she was living and who was kind to her."

Did the grantor and donor "fully understand the nature and effect of the transaction?" He had but eight days before made an entirely different disposition of his property, for the purpose of arranging with his wife, and not as a gift, whereby his property was secured for his own use, and for the ultimate benefit of the children of his adopted daughter, by which his interests were fully protected by a large number of carefully drawn provisions, having the interests of himself and those children in view, charging all his property with these trusts and conditions; and notwithstanding all the controlling inferences to be drawn therefrom, it is said that he within these eight days voluntarily released all of these safeguards, gave away his power to provide for himself in his old age so carefully provided for in the first deed, relinquished all idea of providing for the

natural objects of his bounty, the children of his adopted daughter, who occupied so prominent a part of his well considered scheme embraced in the first deed, and in addition made this voluntary conveyance to the same person whom he had but just before controlled by so many prudently devised stipulations and conditions.

Moreover, it is found that the grantee and her husband have no other property except this so conveyed to them. Intrinsically viewed, could anything be more irrational than to say that the grantor did this thing with full knowledge and with a settled intent?

There is absolutely nothing in the case to indicate any real change of mind on the part of the grantor as to the disposition of his estate. Is it to be believed that this miserly and penurious old man would, under any circumstances, voluntarily and intentionally give away all his property, and especially that he did so on November 17th after so distinctly declaring his contrary intent by the deed of November 9th?

But it is said that the committee find that these conveyances were voluntarily made, and without importunity from any one; that Blackman had sufficient mental capacity to transact business, and that he understood the business he was doing.

As a matter of course the gift was voluntary; that is the assumption in all cases of this character. But was it fair, equitable, made upon competent and adequate advice, and looking at all the facts and circumstances? Did these conveyances embody his real intent?

He was feeble in body, and greatly excited for fear of losing his property because of threatened litigation. Has this trustee, this donee of trust property, shown to the satisfaction of a court of equity that this gift was not the result of his feebleness and of the condition of his mind greatly excited over the contemplated loss of his property? Why this great excitement at the prospective loss of his property if all he desired was to rid himself of its burden?

Additionally, the conduct of all these parties for a long

Nichols v. McCarthy.

time after these conveyances indicates clearly that the real intent of this transfer was not a gift, for it is found that "the receipts from the store and tin shop, and the rents from tenements on said property, were paid to Blackman, and the business of said store and tin shop down to the time of this action were conducted by Blackman." In a word, all the parties have at all times treated this property as if these conveyances were inoperative, and as if Blackman was the real owner. This is wholly at war with the theory that it was a fair, free gift, made upon full knowledge and information.

Mary Ann McCarthy, the donee, took part in the transactions that resulted in this so-called gift. She was a party to them, and assisted in the consummation of some of the details of the transaction after the first deed. She was in the full confidence of Blackman, the trust relation continued both as a presumption of law and as a matter of fact, and now this donee of a trust estate says she can hold the trust property because she did not advise the gift, but that it was made through the advice and influence of one Michael Kenney, "a Michigan lawyer." There is no such finding in the case, and it is only by inference that this is claimed. But courts of equity will not resort to inferences to find facts not expressly found to sustain gifts of this kind. The burden of proof is on the donee to prove clearly and satisfactorily all things essential to sustain the gift.

Plainly the advice of Kenney to Blackman, if such advice was acted upon, was wholly incompetent and inadequate, unless there are other reasons than those appearing in the case; and if there are other facts and reasons tending to sustain this gift the donee must prove them.

Even if it should be admitted that the dealings of Kenney with Blackman constituted the independent advice so strongly insisted upon in the books, and even if that advice had been competent and adequate, she fails to fill the measure of proof requisite as to the fairness and equity of the gift; and certainly the evidence as to a real intent to deliberately and freely give is weak, doubtful and unsatisfactory.

If it should be admitted that on the 17th of November Blackman intended to give, absolutely and freely, this property to Mary Ann McCarthy, the fact that he had so radically changed his mind since he executed the deed of the 9th not only in respect to his personal interests and future life, but with reference to the other objects of his bounty, would, when taken in connection with his miserly and penurious disposition, and the state of great excitement that he was in, indicate strongly that he was incapable of appreciating the actual condition of himself and his property, and the relations of himself to that property and to those whom he so shortly before intended should be joint beneficiaries with her; and under either hypothesis the gift cannot prevail.

The finding of the committee that he had sufficient mental capacity to transact business, and that he understood the business he was doing, is not conclusive upon the question of intent, and is too brief, narrow and inconclusive; for this language is used in connection with references to his ordinary business; and even if he did know that he was executing a warranty deed and bill of sale, there is no evidence that he fully realized the whole scope and effect of his acts.

It is claimed on the part of the defendants that the conveyances made by Blackman were made to evade a threatened attachment of his property in a suit to be brought by his wife for her support, and that, even though the case be one where in other circumstances a court of equity would set aside the conveyances, yet it will not lend its aid to a party to recover property conveyed away for such a purpose.

It is a well settled rule that where a debtor understandingly and deliberately conveys away his property to defraud or hinder his creditors, a court of equity will not lend him its aid to recover the property back. But this is a defense which it is certainly very inequitable for these defendants to make, standing as they do in a confidential relation to the grantor. It is not perhaps an established qualification of the rule mentioned, that a person who, in retaining property conveyed to him, is himself guilty of a fraud, cannot

avail himself of the prior fraud of the grantor for the purpose of keeping the property, but such a qualification of the rule is at least implied in *Railroad Company* v. *Durant*, 95 U. S. Reps., 579, and *Byington* v. *Moore*, 62 Iowa, 470. Such a qualification seems a reasonable one.   However this may be, we think  the case does not come within the application of the general rule for another and perhaps more decisive reason.   In the first place, it is not found that Blackman made the conveyances to avoid the threatened suit.   It is only found that " his wife had  contracted debts in his name without his knowledge and was threatening suit for support ; " and that " these things, together with the complaint for divorce and  attachment  for alimony, greatly excited him, and he was in great fear that he was going to lose his property."  This is hardly equivalent to a finding that he made the conveyances to evade the claims of his wife or of his creditors.   In the next place he was in a state of great excitement.   The facts detailed show the agitated condition of his mind.   The divorce suit and  attachment for alimony was a matter gone by and settled, but which yet contributed to the disturbance of his mind.   It had previously been found that he was in feeble health, and an old man.   In these circumstances, what he did in his excited state of mind, in really a panic, ought hardly to be regarded as done with a deliberate intent.   It was the hasty and inconsiderate work of a mind somewhat broken at the best, easily agitated, and, by the agitation, thrown off its balance. . We think that, in the circumstances, the conveyances should not be treated as conveyances in fraud of creditors, and that the court should  not make it a ground for refusing its aid to recover the property back.

In conclusion, we think it apparent that this gift of a *cestui que trust* to the trustee was improvident and irrational, hastily made, not upon due consideration, nor with competent, independent advice, wanting the elements of fairness and equity, that the presence of a real intent to give freely and deliberately is not proved, or that he was mentally unable to make a valid gift to his trustee.

The plaintiff remonstrated against the acceptance of the report of the committee because "it was in evidence and not contradicted that Kenney, a Michigan lawyer, advised Blackman that the trust deed was good for nothing, * * * and that the subsequent conveyances, to wit, the deed of gift and the bill of sale, were executed under the advice of Kenney, and that Blackman was made to believe, and did believe, that these conveyances were necessary to enable his counsel to obtain proper relief from the threatened acts, &c; but the committee made no finding upon the subject." To this statement in the remonstrance the defendants demurred, thereby not denying the accuracy of the statement.

Assuming, then, that the committee did refuse to so find, it must have been on the theory that it was not important; and it is upon this theory that the court below went in overruling the remonstrance. If that advice, as claimed, was given, and Blackman did, in fact, make these last conveyances, not for the purpose of making a gift to Mary Ann McCarthy, but, being so advised, in order to obtain relief from threatened litigation, then that fact is conclusive against the validity of this gift; for, as has been said so often, unless the gift is really and freely made, with the real, deliberate intent to give, the transaction cannot be sustained. The committee should have found one way or the other on this subject, if there was evidence in the case pertinent thereto and a finding was claimed, and this is alleged in the remonstrance, and, for the purposes of this case, admitted.

The court erred in overruling this part of the remonstrance; but it is understood upon the argument of this case that the plaintiff now only seeks to set aside the deed of November 17th and bill of sale of November 19th; and as we are of opinion that, upon the facts found and stated in the committee's report, those conveyances must be set aside, the judgment of the Superior Court is reversed.

In this opinion the other judges concurred.