ALBERT E. MITCHELL ET AL., EXECUTORS (WILL OF
E. ANNA MITCHELL) *vs.* SPOFFORD FRANK
WYCKOFF ET ALS.

SPOFFORD FRANK WYCKOFF *vs.* ALBERT E. MITCHELL
ET AL., EXECUTORS AND TRUSTEES (WILL OF
E. ANNA MITCHELL).

MALTBIE, C. J., HINMAN, BANKS, AVERY and BROWN, Js.

Argued June 11th—decided July 30th, 1936.

*Raymond E. Hackett,* for the appellant (Wyckoff).

*Warren F. Cressy,* for the appellees (Mitchell et al. Executors).

*Charles E. Moore* and *P. Lawrence Epifanio* appeared for Robert L. Wyckoff.

*Edwin F. Morse* appeared for William N. Wyckoff et al.

*William L. Tierney, Jr.,* appeared for Edwin Wyckoff.

Avery, J. E. Anna Mitchell died March 28th, 1933, leaving a will. After her death, there were found among her effects three executed contracts with her son, Spofford Frank Wyckoff. Later, he presented to the executors an unexecuted copy of a fourth contract claiming that it had been executed in January, 1919. The first named action was brought by the executors to determine the construction of the several contracts in connection with the will, to determine whether or not the alleged 1919 contract was ever in fact executed, and to procure the advice of the Superior Court in relation to their duties under certain provisions of the will. The second named action was brought by her son who claimed that certain shares of stock disposed of by the will of the decedent were his property and asked that the court so declare; that the executors be ordered to deliver the shares to him; and asking for an accounting and judgment for any sum found due thereon. The two cases were tried together and judgment entered against the claims of Spofford Frank Wyckoff in both cases, and from this judgment he has appealed.

Among the material facts found by the court are these: Frank T. Wyckoff, the husband of E. Anna Mitchell and father of the appellant, died intestate February 17th, 1903. Spofford, who was their only child, was born August 30th, 1890. Prior to his death, Frank T. Wyckoff was the owner of six hundred and ninety shares of stock of the Wyckoff Pipe Company of Pennsylvania; certain associates owned the remaining two hundred and ten shares. The company was engaged in the business of creosoting wood and had not been particularly successful at the time of his death. He had partially completed the organization of a Connecticut corporation called the Wyckoff Pipe and Creosoting Company on the basis of one share of new stock

for two of the old. Mrs. Wyckoff completed this organization after his death. She claimed that her husband had given her his stock before his death and three hundred and forty-three shares of the new stock were issued in her name and one of her shares to each director. She never inventoried these as part of her husband's estate of which she had been appointed administratrix by the Court of Probate for the probate district of Stamford. In 1908, she married Albert E. Mitchell who has survived her.

Under her management and that of Mr. Mitchell, the plant was rebuilt and the business enormously increased. Dividends amounting to $253,250 were paid to her prior to May, 1912. In April, 1906, and before the first dividend was paid her, she acquired the one hundred and five shares of the new stock owned by her first husband's associates, and from that time claimed to own the entire four hundred and fifty shares of the new company. Spofford was elected secretary of the company when he was sixteen years of age, had attended some of the meetings and was familiar with the corporate books. He attended the Yale Law School, from which he graduated and was admitted to the Connecticut bar. While in the law school, he married. In 1910, litigation started in the Court of Probate in Stamford, Spofford claiming that the stock left by his father at his death belonged to the estate. There was long litigation and the Court of Probate finally decided that Spofford was the owner of two hundred and thirty shares and Mrs. Mitchell the owner of two hundred and twenty shares. From this decision, she appealed to the Superior Court and while the appeal was pending, after much negotiation, the parties arrived at a settlement; and, on April 29th, 1912, a contract was executed between them. This contract, among other things, provided that both Mrs. Mitchell's stock and

Spofford's stock was to be held by Mrs. Mitchell as trustee for both. If he predeceased her, one-half of the stock and two shares in addition were to revert to her; if his widow remarried, all of the stock was to revert to her; if Mrs. Mitchell died first, all of the stock was to belong to Spofford; if the plant or stock was sold to an outsider, they were to divide the proceeds equally. Mr. and Mrs. Mitchell's salaries were fixed, and Spofford was to receive $500 a month in consideration for his active services to the company, and one-half of the dividends. The agreement provided that their controversies as to all other matters were settled and Spofford expressly agreed to waive all claims against his mother by reason of dividends theretofore declared or paid upon the stock of the company. He also consented to the entry of an order discharging Mrs. Mitchell as administratrix and to the cancellation of her bond. A copy of the agreement was filed with the Court of Probate and thereupon it accepted Mrs. Mitchell's account without requiring her to account for the stock or dividends upon it, and from that decree no appeal was taken.

From the finding, it further appears that at the time of the execution of this agreement, Spofford was not only a member of the bar but was represented by able counsel; that he had access to the books of the company for years and was in a position to know and understand its affairs; and that he acted at arm's length with his mother with full knowledge and understanding of the nature of the contract. Among other things, the agreement provided for its termination at any time by the consent of both parties.

While still in the law school, Spofford had become addicted to the habit of drink. This habit increased and after entering the service of the company in 1912, he desired to leave, and, on October 30th, 1915, a new

agreement in writing was executed by Spofford, his mother and the company. By this agreement Wyckoff gave up any right and claim he had to the $500 monthly salary for service to the company and it was provided that the company would pay him $350 a month, upon his agreement to enter into active business and not live in idleness unless poor health should prevent his carrying on the business, in which case the payments were to be made, with a further provision that he should not enter into a business east of the Mississippi River which would compete with that of the company. He gave up his right to dividends and relinquished to his mother all right and interest which he might have in the stock of the company. The agreement of 1915 expressly cancelled the agreement of 1912 between the parties. It further provided that the contract of 1915 was to become null and void at any time upon the mutual consent of Spofford and Mrs. Mitchell, in case of any breach of it by him, or in case of his death.

From the date of this agreement, Spofford devoted no substantial period of time to the business of the company. In December, 1915, he became involved in difficulties with his wife who knew about the contract of 1912. In order that she might not be able to attach his money by garnisheeing his mother, a further agreement was executed between Spofford and his mother on January 10th, 1916, by which that of October 30th, 1915, was terminated; and, on that day, he entered into a spendthrift agreement with his mother which was not to become operative except upon his demand. Since no demand was made by him, this agreement did not become effective. Mrs. Mitchell continued to make the payments to Spofford as required under the 1915 agreement. On January 25th, 1916, the stock certificates theretofore held by

Mrs. Mitchell as trustee, under the agreement of 1912, were re-issued in her name individually, upon written directions signed by both Mrs. Mitchell and Spofford, and they have since so remained. On April 3d, 1917, a further agreement was executed between Spofford, his mother and the company whereby that of October 30th, 1915, was reaffirmed and acknowledged to be in full force and effect, except as modified by the omission of one paragraph and the amendment of another. The amended paragraph was to the effect that upon the death of either the agreement should terminate, and it might be terminated at any time by the mutual consent of both; and, further, it might be terminated by Mrs. Mitchell in case of material breach by Spofford. This was the last agreement executed between the parties; the one alleged to have been executed in 1919 was never in fact executed.

On the trial the basic claim on behalf of Wyckoff was that the agreement of April 20th, 1912, should be recognized as the only legal and valid agreement and that under it, if Mrs. Mitchell died before him, which she did, he became the sole owner of the stock of the company. By her will Mrs. Mitchell bequeathed the stock to trustees, to be turned over to Wyckoff only if and when certain conditions were satisfied, whereas Wyckoff claimed that he was entitled to a literal compliance with the terms of the 1912 agreement. The trial court concluded, however, that the 1912 agreement was cancelled and superseded by that of 1915, and that, as subsequently modified, it was fully performed by Mrs. Mitchell. The validity of these conclusions is questioned by the appeal. The appellant also claims that the court erred in certain rulings upon evidence. In his appeal, the appellant contends in substance that by the agreement of 1915 Mrs. Mitchell in effect received a gift from her son of the shares of

stock, and that inasmuch as at that time she was holding shares as trustee the gift is invalid as a matter of law. The appellant relies upon the case of *Nichols* v. *McCarthy*, 53 Conn. 299, 318, 23 Atl. 93, where we said that where a contract or gift is claimed adversely to the beneficiary in the trust relation, courts of equity require "the most ample and convincing proofs of the entire fairness of the transaction, and possession of full information, knowledge and intentional action on the part of the beneficiary, after competent and independent advice and deliberate consideration." The principle of this case is approved by us in *State* v. *Culhane*, 78 Conn. 622, 628, 63 Atl. 636, and *Sachs* v. *Feinn*, 121 Conn. 77, 85, 183 Atl. 384.

In view of the facts appearing in the finding, however, the principle of these cases does not have any application to the situation presented in the instant case. While Mrs. Mitchell became trustee of the stock of the company under the 1912 agreement, that trust was of very limited nature, hardly more than a device for effectuating an agreement between the parties to which they had come in a transaction where they were dealing with each other at arm's length. Spofford was in a position where he must have known about the value of the stock and the prospects of the company and the trial court has found that from 1910 until his mother's death his dealings with her were of a shrewd, selfish and grasping character. In 1912, when the first contract was made, Spofford had the advice of experienced counsel and the contract was made with full knowledge on his part of his rights. It was, in effect, a family settlement and, among other things, created a voluntary trust in respect of the stock. This contract provided by its terms that it might be modified or abrogated by mutual consent. Such a contract may be terminated at any time by the agreement of all

parties. *O'Brien* v. *Holden*, 104 Vt. 338, 160 Atl. 192, 196; *Matthews* v. *Thompson*, 186 Mass. 14, 18, 71 N. E. 93; *Capron* v. *Lochars*, 110 N. J. Eq. 338, 160 Atl. 83, 85, affirmed 112 N. J. Eq. 373, 164 Atl. 447. In 1915, the parties did so modify and terminate it and under the modified contract Spofford gave up certain rights and received in compensation therefor certain others. The finding does not justify the claim that Spofford's mental or physical condition was so impaired when the 1915 agreement was made that he was not then in a condition fully to appreciate its contents and effect and to protect his own rights. After it was made, except for a brief time when he returned to the service of the company, he continued to receive and accept the monthly payments provided in it until his mother's death. There is no basis in the finding for any inference that the arrangement was unfair to him or that any advantage was taken of him. Both parties were of full age. The relationship of mother and son did not constitute such a fiduciary relationship as would forbid the parties of the contract of 1912 from agreeing to terminate it in accordance with its provisions. *Preston* v. *Preston*, 102 Conn. 96, 128 Atl. 292.

That there was a consideration adequate in law to support the 1915 agreement is plain. Under the 1912 agreement Spofford was to be employed by the company at a salary of $500 a month which was to cease if at any time he quit its service, and he then would have been entitled to receive no income except one-half of the dividends declared by the company, whatever their sum might prove to be. The agreement of 1915 expressly gave him the right to engage in other business and provided that the company would pay him monthly the sum of $350 so long as he carried on an active business and even if he did not, if this were

due to ill health. He solicited and prepared the agreement to serve his own purposes. The appellant rests his contention quite largely upon a claim that there was an entirely inadequate consideration for the surrender in the 1915 agreement of Spofford's right to receive one-half of the dividends declared upon the stock and the stock itself should he survive Mrs. Mitchell, rights which were given him in the 1912 agreement, and that this claimed inadequacy of consideration is sufficient reason to regard the 1915 agreement voidable at his option.

In determining whether a transaction between a trustee and a cestui que trust wherein the former acquires property from the latter is valid, adequacy of consideration is undoubtedly an important and may be a controlling consideration. *Nichols* v. *McCarthy,* supra; *State* v. *Culhane,* 78 Conn. 622, 629, 63 Atl. 636. While measured in dollars and cents there might seem to be a disparity between the advantages Spofford obtained by the modification of the 1912 contract and the gain to Mrs. Mitchell which resulted therefrom, the finding makes it abundantly clear that by the transaction Spofford secured something which he very much desired, an assured income while freed from the necessity of serving the company, with the opportunity to live in the West which he wanted to do. Particularly in view of the unusual circumstances in this case, the consideration received by Spofford was not so clearly inadequate as to establish that fraud or inequitable advantage which is the real basis upon which equity gives relief in a transaction between a trustee and the cestui que trust. 2 Pomeroy, Equity Jurisprudence (4th Ed.) § 956; 3 Bogert, Trusts & Trustees, § 493. Taking into consideration all the facts of this case, which as detailed in the finding we have not attempted fully to state, we cannot say that the trial

court erred in regarding the 1915 agreement as one which was not voidable at the option of Spofford.

With reference to the effect of the agreement of January 10th, 1916, expressly terminating the agreement of 1915, the appellant makes alternative claims based upon two possible aspects of its effect. One claim is based upon the assumption that the agreement must be given effect because the only way for the appellees to avoid it is to rest upon the contention that it was a fictitious transaction made for the improper purpose of defeating any attempt of Spofford's wife, then in controversy with him, to reach his property; and the other claim is based upon the assumption that the agreement, being without consideration and never intended by the parties to affect their rights, is entirely to be disregarded. The trial court concluded that the agreement of 1915 was "ostensibly modified" by that of 1916 at Spofford's request and for his supposed protection against his wife, and that unless and until she involved Mrs. Mitchell in litigation designed to sequester his income both Spofford and Mrs. Mitchell intended that the payments should continue to be made to him under the 1915 agreement.

That the parties did not intend that the 1916 contract should become at once effective and that they did not regard it as ever having come into effect is substantiated by the provisions of the final agreement of 1917 which in terms "re-affirmed" the 1915 contract and "acknowledged [it] to be at this date in full force and effect" except as modified and that "as so modified [it] is hereby ratified and confirmed." This is not the language of an agreement again bringing into effect one which has ceased to exist but it confirms one which the parties evidently regarded as still in force. If they did intend that the 1916 agreement should not come into effect except on a contingency which never

happened, the law could not give it force. *Burns & Smith Lumber Co.* v. *Doyle,* 71 Conn. 742, 745, 43 Atl. 483. The 1915 contract contained an express provision that it might be ended at any time by the mutual consent of the parties. They could, whenever they chose, defeat any attempt of Spofford's wife to sequester the payments provided for by agreeing to terminate the contract, even though the purpose was to defeat these attempts. *Collins* v. *Smith,* 78 Mass. (12 Gray) 431, 436. The situation does not fall within the principle that a party will not be permitted to set aside a conveyance made for the purpose of defrauding his creditors; *Gest* v. *Gest,* 117 Conn. 289, 167 Atl. 909; and proof of the condition upon which the effectiveness of the agreement was based would not involve any situation obnoxious to the law so as to prevent the appellees taking advantage of it. *Searle* v. *Crampton,* 118 Conn. 42, 170 Atl. 480.

The 1916 contract never became effective. It follows that when the agreement of 1917 was made the agreement of 1915 was still in force. The modifications of the 1915 contract made by that of 1917 in no way affect Mrs. Mitchell's ownership of the stock. Those modifications consisted of the cancellation of a provision of the 1915 contract that if at any time the company's financial condition was such that full salaries could not be paid to its officers the sums to be paid to Spofford should be reduced only in the same percentage as were the salaries, the effect being to leave unqualified the obligation of the company to pay him $350 a month, and in a substitution in place of the provision of the 1915 agreement that it should terminate on the death of Spofford, of one that it should terminate at the death of either himself or Mrs. Mitchell. Thus both Spofford on the one hand and Mrs. Mitchell on the other gained an advantage,

the first by the assurance that the payments to him in full sum provided were to continue and the other in the termination of the payments upon Mrs. Mitchell's death. The agreement of 1917 was supported by a sufficient consideration.

In the course of the trial, much evidence was offered by the executors and admitted over the objection of Spofford as to his numerous marriages and divorces and his manner of living, particularly with reference to his habits with regard to drink. In so far as this testimony was elicited by cross-examination of Spofford, it was admissible for the purpose of attacking his credibility. Beyond that, the issues in the case as it was tried involved numerous possible claims, many of which have not been presented by the appeal. Thus the 1915 contract provided that Spofford should engage in active business unless prevented by poor health and that the contract should terminate upon its breach by him; he attempted to prove an agreement, purported to have been made in 1919, which gave him substantial rights but which was not executed by the parties; he claimed that the various contracts were made at Mrs. Mitchell's solicitation and solely for her accommodation; he offered evidence of claimed representations by her down to the time of her death that the 1912 contract was binding on her and he would have the stock at her death; he claimed in his pleadings that he was induced to sign the various agreements because of fraudulent representations and fraudulent concealments on her part and that in effect she overreached him for her own selfish ends. It is difficult to see how the trial court could properly have considered the issues in the case without having before it a complete picture of the circumstances which might have affected the relationship between mother and son. Without discussing the rulings on evidence which

are set forth in great detail in the finding, it is sufficient to say that we find no reversible error therein.

The will made certain provisions for the testatrix's husband. He has declined the provisions made in his behalf and has elected to take his statutory share. That share is to be set out for him as provided in General Statutes, § 5156. By article twelve of the will, two-thirds of the income from the residue is payable to Spofford in the discretion of the trustees, but in no case shall such payment be less than $400 a month together with the additional payments necessary to pay taxes on certain real estate in California. The executors were advised by the Superior Court that in case the income from the residuary estate is insufficient to pay Spofford $400 a month, the executors should pay only such portion thereof as the actual income might produce. The language of the paragraph clearly indicates the intention of the testatrix that he should be paid not less than $400 a month. That such was her intention appears from other provisions of the will. By the eleventh paragraph, her stock in the company was given to three trustees with directions to hold it and manage the company, and inasmuch as it was her desire that her son Spofford should ultimately become the owner of the stock, these trustees were directed to give him an opportunity of entering the business and, when his experience and habits justified, to turn over the control and management to him together with all the stock in the company. If he gave his services to the company, he was to receive $400 a month for such services; if he refused or was unable to enter the employment of the company, they were to pay him $400 a month and such dividends as might be declared; if he failed to enter the services of the company within two years,

the trustees were empowered to sell the company and to hold the funds derived from the sale and to pay out of the income thereof to Spofford $400 a month with such further sums as might seem to them advisable for his maintenance during his life. In the case of his death, the proceeds were to become part of the residuary estate. Moreover, under the agreement of 1915, Spofford received $350 a month, which payment was to terminate upon his death. We conclude, therefore, that from the express language of this paragraph considered with reference to the other parts of the will and the circumstances surrounding the testatrix at the time the instrument was made, it was clearly her intention that Spofford in any event should receive $400 a month from the residuary estate. The executors and trustees should be advised that under the twelfth paragraph of the will, Spofford is entitled to the income from two-thirds of the residuary estate; in case the income is not sufficient to pay him $400 a month, he is entitled to such payment out of the principal of the residuary estate. Inasmuch as the surviving husband has elected to take his statutory share and not under the will, and Spofford on March 4th, 1933, gave notice through his counsel that he would give permission for the sale of the property, a course which the executors deemed highly advisable, and as the house is now vacant, the trial court did not err in not answering the question propounded for advice by the executors and trustees under the seventh article of the will.

In view of the conclusion reached with reference to the 1916 agreement, it is not necessary to consider the appellant's application to rectify the appeal.

In the case of *Mitchell* v. *Wyckoff et al.* there is error in the judgment only and the cause is remanded to the Superior Court with direction that judgment be

entered advising the executors and trustees in accordance with this opinion; in the case of *Wyckoff* v. *Mitchell* there is no error.

In this opinion the other judges concurred.