AYRES v. THE C., R. I. & P. R. Co.

1. **Contract**: CONSIDERATION. An agreement to do what one is already under a legal obligation to do does not constitute a consideration for a contract.

2. ——: ——: RULE APPLIED. The citizens of O. subscribed twenty thousand dollars to be paid to a railroad company if its line should be completed to their place on the first day of January; the company contracted with Q. for the construction of a portion of the road; after performing a part thereof, Q. informed the president of the company that he owed for supplies, and that he could not complete the work at the contract price; the president then instructed him to go on with the work, promising him and the agent of his creditors that for money actually expended in the work he should be paid, and that the just claims of his creditors should be met, and thereupon Q. proceeded with the work: *Held*, that the agreement of the president of the company was without consideration.

3. ——: PARTNERSHIP: DEATH OF PARTNER. The death of a member of a partnership will not release the surviving members from the obligation to perform the contracts of the firm, except where the personal service or peculiar skill of the deceased partner is required for their performance.

*Appeal from Mahaska Circuit Court.*

SATURDAY, DECEMBER 6.

SOMETIME in the year 1875, a number of the citizens of Oskaloosa, desirous of securing an extension of the Washington & Sigourney branch of the Chicago, Rock Island & Pacific Railroad from Sigourney to Oskaloosa, agreed to pay to the Chicago, Rock Island & Pacific Railroad Company the sum of twenty thousand dollars when the track of said railroad should be completed from the town of Sigourney into the city of Oskaloosa, provided that if the track should not be completed from the town of Sigourney into the city of Oskaloosa on the first day of January, 1876, the parties executing said agreement should be discharged from the obligation to make payment of one-half of said sum.

On the 10th day of June, 1875, the Chicago, Rock Island & Pacific Railroad Company entered into a contract with Queally & Bro., for the building of a portion of said road. This

contract contains the following provisions: "The work shall be commenced immediately and shall be fully completed in accordance with the terms of this contract, on or before Decem ber 1st, A. D. 1875. If the parties of the first part refuse or unreasonably neglect to remedy any imperfections pointed out by the engineer, or in any manner violate the conditions of this contract, so that in the judgment of the engineer there will be just grounds of apprehension that the work will not be completed in the manner and within the time specified, then it will be the duty of the engineer to serve a written notice upon said party, setting forth the grounds for this apprehension, and specifying the manner together with the reasonable time in which the party of the first part may cause such grounds of apprehension to be removed, and if at the expiration of said time said grounds of apprehension be not removed, then full power is hereby vested in said engineer to declare the contract forfeited, and upon such declaration being given in writing to the parties hereto this contract shall determine immediately, and the party of the second part may forever retain the reserved per centum in consideration of the damages they may have sustained by reason of the forfeiture of the contract, or as an alternative to the declaration of forfeiture the party of the second part shall, on written report to the engineer that apprehensions are entertained that this contract will not be completed in the time and manner herein stipulated, have the right to take such measures as may be deemed by the engineer necessary to insure the completion of the work in the time and manner herein stipulated, and to deduct from the monthly and final estimates of the work done under the contract such sum or sums as may be required to defray the expenses of such measures. Among the measures which, under such circumstances, may be resorted to are the execution by their own agents of such portion of the work as said engineer may select, or the requirement that the parties of the first part shall provide for and employ in the most efficient manner such additional men, carts, teams, etc., as the party of the second part may furnish, in which case said parties of the first part agree to employ said men, carts, teams, etc., in the manner directed

by the engineer, who shall have the right to retain from the estimates an amount sufficient to pay said men, carts, teams, etc." Pursuant to this contract Queally & Bro. commenced work in June, 1875. On the 13th day of August, 1875, they executed a power of attorney to C. A. Weed, authorizing him to do all things necessary to the carrying out of the above contract, and placed him in the actual management of the work. On the 26th day of August, 1875, J. J. A. Queally, the senior and active business member of the firm of Queally & Bro., died.

The contract proved not to be a profitable one, and up to the time of the death of the senior member of the firm it had been carried on at a great loss, and a large amount was due to merchants and others for provisions and supplies which had been advanced to laborers, the amount of which was deducted from their pay on the rolls. After the death of J. J. A. Queally, it is claimed by plaintiff that Weed informed Hugh Riddle, the vice president and chief engineer of the C. R. I. & P. R. R. Co., of the condition of affairs, and that Riddle, on the 15th day of September, 1875, requested the work to be carried on in the name of Queally & Bro., and agreed to pay whatever debts had been or might be contracted in the prosecution of the work. From the 1st day of July to the 13th day of September, 1875, the plaintiff sold and delivered goods, wares and merchandise to divers persons in the employ of Queally & Bro., and to the contractors working under Queally & Bro., on account of which the plaintiff claims of the defendant the sum of three thousand dollars under the agreement above claimed. The plaintiff also claims to be assignee of various persons who furnished hay, corn, meat, etc., to Queally & Bro., and to the contractors working under Queally & Bro., and their employes. The evidence shows that all the claims of the alleged assignors of plaintiff, with the exception of a very inconsiderable sum, arose prior to the 12th day of September, 1875, and, as to this small sum credit was given to the contractors and subcontractors to whom, and on whose orders, the sales were made. On account of all the demands the plaintiff claims of the defendant fifteen thousand dollars. There was a jury trial, resulting in a verdict for plaintiff for

$9,797.72. The jury also returned the following special findings:

"Do you find that the defendant made a parol promise to pay the debts of Queally & Bro., and the sub-contractors, t' at were due to the plaintiff and his assignors in this suit? Answer: Yes.

"When were said promises made—give the months and dates? Answer: On or about the 12th or 13th of September, 1875.

"To whom were said promises made; give the names of all persons to whom you find the said promises to have been made. Answer: To John F. Lacey, C. A. Weed and F. J. Queally.

"Do you find that Mr. Riddle about the middle of September, 1878, made a parol promise to Mr. Weed, as the agent of Queally & Bro., to see that the debts of said Queally & Bro. to the plaintiff and his assignors in this suit should be paid? Answer: Yes.

"What was the consideration for such promises? Answer: It was to prevent the stoppage of work on the road, and to enable the railroad company to get its road completed at an early day, and in order that it might draw the money subscribed by the citizens of Oskaloosa."

The defendant's motion for a new trial was overruled, and judgment was rendered for plaintiff. The defendant appeals.

*M. E. Cutts*, for appellant.

*John F. Lacey*, for appellee.

Day, J.—The plaintiff introduced C. A. Weed, general manager for Queally & Bro., who, amongst other things, testified as follows: "I went to Chicago three times after the death of J. J. A. Queally, to confer with Mr. Riddle about the business, and I had a conference with him at Oskaloosa in regard to the financial matters of the work. The first interview was about September 15, 1875, after the death of Mr. Queally, when I went to Chicago at the request of Mr. Riddle, with the pay rolls from the beginning of the work to the 1st

of September, and other papers and figures relating thereto, which he examined. I told him that Queally & Bro. were losing money, and that it would be impossible for them to complete the work at the contract price, and unless they received aid in some way from the company they would have to throw up the work. He said that at that time he could not advance the price, nor would he allow Queally & Bro. to throw up the work; that he wanted the work to proceed to completion under the name of Queally & Bro., and for me to remain as manager of the work, and at its completion, if he saw the work had been handled economically, that then he would advance money sufficient to pay the actual expense of the work. He also said that as Queally & Bro. had proven themselves unable to carry on the work financially, and it would be necessary for the company to advance money to pay for the labor, supplies, etc., that he would send a man to Oskaloosa to handle the money advanced by the company, taking my receipt for the money paid out as agent of Queally & Bro., that man to also vouch for all bills of merchants of whom we were getting supplies, so that they would feel safe and continue to give credit to Queally & Bro; it was at my own request that this man was sent for the above purpose, as the merchants, mechanics and others whom we had dealt with at Oskaloosa for necessary supplies, had after the death of Mr. Queally found that Queally & Bro. were unable to pay their bills, and would, therefore, give them no more credit, without which the work would have to stop, all of which I told Mr. Riddle, and that in order to carry on the work under the name of Queally & Bro. it would be necessary for him to send a man to Oskaloosa who should have power to approve all debts contracted for the necessary expenses of carrying on the work. F. J. Queally was present with me at this interview, from whom Mr. Riddle required a power of attorney empowering me to do the business of Queally & Bro. on the contract between them and the railroad company, said power of attorney to be signed by F. J. Queally as surviving partner of Queally & Bro., which power of attorney was made out, at the direction of Mr. Riddle, by some one in his employ. At

this time there was quite a large amount due to merchants and others at Oskaloosa for provisions and supplies which had been advanced to laborers and was deducted from their pay on the rolls, which Mr. Riddle said, if after a thorough examination of the books and rolls of Queally & Bro. they were found to be honest and legitimate, would be paid, but, until the books and accounts of Queally & Bro. had been looked over by a man whom he would send, he could do nothing about it. He told me to tell the people of Oskaloosa whom we had dealings with he would see that all bills contracted for by Queally & Bro., for supplies necessary for carrying on the work, would be paid."

Respecting this same interview at Chicago F. J. Queally testified as follows: "About the 10th of September, 1875, I met Mr. Riddle for the first time. I then told him the contract was a losing business at the price he was then paying per yard, and wanted him to take the contract off of our hands or raise the prices. He then said that we should go on with the contract at the present price, and under the same name, Queally & Bro., and any deficiency in the monthly estimate of the work, and the actual contracts made by us in carrying on said work would be paid by the Chicago, Rock Island & Pacific Railroad Company, the defendant. He reserved the right to place a man, his own man, in charge of the money, to see that said money was used in the right channel in paying for said work and contracts made by us in carrying on the work.     *     *     *     *     The consideration for this agreement of Mr. Riddle was that he did not want to go to the trouble of reletting the contract to another party and having the work stop. Mr. Riddle put a man in charge of the work and to pay out the money."

The witness Weed testified to another interview with Mr. Riddle in Chicago in November, as follows: "At another time John F. Lacey and myself went from Oskaloosa to Chicago at the request of Mr. Riddle; Mr. Lacey went as attorney for the creditors of Queally & Bro. The interview between Mr. Lacey and Riddle was in my hearing, and in which I took part. At that time Mr. Riddle told Mr. Lacey and myself

that all of Queally & Bro's indebtedness for supplies advanced to men, as well as board which was charged to men, and which had been stopped from their wages and appeared on the rolls under the head of stoppages, should be paid. He said at that time that he would furnish money to pay off the rolls in full, and all other necessary expenses incurred in building the road, and that no one who advanced anything in the way of necessary supplies should lose anything for so doing; that all money so advanced he would charge to Queally & Bro., and hold it as a claim against them till final settlement. He said he would pay all stoppages on the rolls that had been taken out of the men's wages. He told me to inform the merchants and others at Oskaloosa that they would not lose anything on any necessary provisions or other supplies advanced to Queally & Bro."

Respecting this interview John F. Lacey testified as follows: " Mr. Riddle and I looked over the rolls to see whether the stoppages would cover the amount of claims I represented. During the conversation Mr. Riddle said, Weed being present, that he was willing to pay whatever the road cost, and whatever went into the road he was willing to pay. He told me he had some securities, some shovels and so on, and he did not know what he would get out of them; that there was some contest about them, but that he would pay all these claims that were just, and that went to the men, or that went into the road. When we came back from dinner he claimed that he had found a discrepancy in Ferguson's rolls. He wanted to know why he, Ferguson, had so many men in the last days of September, and on the next day twenty-five or thirty more men. He was mad and spoke rather emphatically. Weed said he could not explain it, but finally explained that perhaps these were a lot of men that had come down from Montezuma, but did not explain it for some time. Mr. Riddle then said that, having made this discovery, he would have to suspend his action. He said previously he would pay at once, but he said afterward he would pay it if there was no fraud in the matter, but he would have to investigate it. He was angry, and Weed's explanation was not prompt enough. The

interview ended pretty soon, and he told me he would write me. He made no further promise. Mr. Riddle made the promise to me. He said to Mr. Weed: 'I always told you I would not release you from your contract, and shall charge this up to Queally & Bro.' Mr. Riddle said he would charge all these amounts up to Queally & Bro. under their contract."

The witness Weed testified to another interview between himself and Mr. Riddle, as follows: " At the interview between him and myself in Oskaloosa I spoke to him about the indebt-edness of Queally & Bro. for supplies furnished for the work, told him the creditors were very anxious about their pay, and he said he was not ready to make any definite answer." The above contains substantially all that was said by Riddle respecting the payment of these claims as shown by the testi-mony introduced on behalf of the plaintiff. . At the time this testimony was offered the defendant objected to all of it which tended to prove an agreement to pay the debts of Queally & Bro., because it is not competent to prove a parol promise by defendant to pay the debts of another. The objection was overruled, and the defendant excepted. The court, amongst others, gave the jury the following instructions:

· " 5. If you find from the evidence that the firm of Queally & Bro. had the contract for grading the defendant's road from the Keokuk county line to the city of Oskaloosa, and that at the time J. J. A. Queally, of said firm, deceased, the firm was insolvent and incapable of going on with the work under the contract, and thereupon the surviving partner, F. J. Queally, had an interview with Hugh Riddle, in which he informed said Riddle of the insolvent condition of the firm and its inability to continue the work further or to pay its outstand-ing debts contracted for necessary supplies and material fur-nished in the construction of the road; that thereupon Riddle orally promised to pay such outstanding debts, and directed Queally or his agent, O. A. Weed, to inform the parties hold-ing such claims that they would be paid, as well as all other necessary supplies and material thereafter furnished in the construction of the road; that such parties were informed of such promise in accordance with the direction of said Riddle;

that the railroad company thereafter sent its agent to Oskaloosa to take charge of the pay rolls and to pay off the workmen and others furnishing supplies for the road, with money furnished him by the company for that purpose; and you further believe from the evidence that the object of said Riddle in making such promise was to prevent the work on the road from being suspended, and to enable the railroad company to have its road completed without delay; that such promise did have such effect; then the defendant is liable upon such promise, although not in writing, provided it is sufficiently shown that said Riddle was the general agent of the company and authorized to make contracts of such character.

"12. If you find from the evidence that the defendant made a parol promise to Queally & Bro., or to the surviving partner of said firm, to see paid the debts of said Queally & Bro. that had accrued and been incurred in the prosecution of the work on the railroad of defendant, under the original written contract executed by said Queally & Bro., to perform said work, and further find that the only consideration for such parol promise was the doing and agreement to do by said F. J. Queally as such surviving partner only such acts as he was in any event under legal obligation to do, and that thereby the defendant acquired and derived no new or additional benefit, right or advantage that it did not before fully have and possess, then such parol promise, not being in writing, is void; and this is so, even though defendant made said parol promise for the purpose of inducing said F. J. Queally to continue said work to its completion under said written contract." This last instruction was given at the request of the defendant.

The case has been presented by counsel in two aspects. *First.* Is there any consideration for the parol promise of the defendant to pay the debts incurred by Queally & Bro., in the prosecution of the work? *Second.* Is the parol promise of the defendant to pay the debts of Queally & Bro. void under the statute of frauds?

A consideration consists of some benefit or advantage ac-

cruing to the promisor, or of some loss or disadvantage incurred by the promisee. The jury in this case found specially that the consideration for the defendant's promise "was to prevent the stoppage of work on the road, and to enable the railroad company to get its road completed at an early day, and in order that it might draw the money subscribed by the citizens of Oskaloosa."

1. CONTRACT: consideration.

I. Does this finding of the jury show a consideration sufficient to support the defendant's promise? The jury have found that the consideration consisted in an advantage accruing to the promisor, to-wit: that the work should not be stopped, but that it should be completed at an early day so that defendant might draw the money subscribed by the citizens of Oskaloosa. But the defendant, under its original contract, had the right to insist upon all these things. The amount subscribed by the citizens of Oskaloosa was all payable if the track should be completed into the city of Oskaloosa on the first day of January, 1876. Queally & Bro., under their contract, were bound to complete the work by the first day of December, 1875. They were under obligation to perform their contract. They had no right to quit work and abandon their contract. If they performed their contract as they agreed, the amount subscribed by the citizens of Oskaloosa would be secured. The consideration, as found by the jury, secured to the defendant no advantage not before possessed. The case of *Reynolds v. Nugent*, 25 Ind., 328, is, in principle, the same as the one at bar. Nugent signed a written contract by which he agreed to enter the military service of the United States to the credit of Tobin township, in consideration of the payment of a bounty of $100. Reynolds, the agent of the township, accompanied Nugent to the mustering office to procure his muster in, and to pay him the bounty promised. While there Nugent was offered by others a bounty of $350, and refused to perform his contract unless the township would pay him that amount, and Reynolds, thereupon, to induce Nugent to perform his contract, promised that he would be responsible that Nugent should receive that amount from Tobin township. The court say: " It is urged

on behalf of the appellant that the promise of Reynolds to pay $350 was void for want of consideration. This position, in our judgment, is correct. The contract was already complete and perfect. Nugent had, as he states, agreed to enter the military service of the United States and have the credit given to Tobin township upon the promise that he should be paid the sum of $100. That promise was binding upon both parties. The one promise was a sufficient consideration for the other. He now claims that the appellant, to induce him to fulfill his legal obligation, promised to pay him an additional sum. There were no new duties assumed by Nugent, but he claims that in consequence of the promise by the appellant he went forward and performed the contract he was already under legal obligation to comply with. If the appellant made the promise, it was without any adequate consideration, and cannot be enforced in law. 1 Parsons on Contracts, 5th ed., 437. That a promise to do what a person is bound to do by law is not a good consideration for another undertaking, and that a person is not bound to fulfill his promise to pay another for doing what he is bound by law to do, is well settled." In *Parmelee v. Thompson*, 45 N. Y., 58, the court say: "If the only consideration for the promise of the creditor is the performance by the debtor, or a promise to perform, some act which he is legally bound to perform, the promise is without consideration." See, to the same effect, *Pulman v. Pulman*, 4 Ind., 612; *Crowhurst v. Tannack*, 16 Eng. L. and Eq., 499; *Gibson v. Renne*, 19 Wend., 389; *Miller v. Holbrook*, 1 Wend., 318; *Stilk v. Myrick*, 2 Camp., 317.

In *Ferterman v. Parker*, 10 Ind., 474, the plaintiff contracted to put in operation a saw mill for the defendant for $100, part of which was paid at the time. The plaintiff afterward refused to go on with the work, because the price was too low, and defendant then sent plaintiff word to do the work and he would pay what was right. The plaintiff did the work and sued for his compensation. The court say: "On the part of the plaintiff it is insisted that, although the first contract

was not rescinded, yet the parties were at liberty to vary it. There is no doubt of this proposition; but it will be recollected that the variation of a contract is as much a matter of contract as the original agreement, it equally requires the concurrence of intention in the parties, it cannot be varied at the mere will and pleasure of either. But in what was the contract varied; not in the work to be done, that was not altered in the slightest manner; the plaintiff came under no new obligation, he was to do the same work he had previously bound himself to do. It was varied, says the plaintiff, in this, that the defendant promised to give an additional fifty dollars, if he would build the mill. Let it be admitted that the defendant, under the cir-cumstances, had, in so many words, promised the plaintiff that he would give him fifty dollars more, or one hundred and fifty dollars for building the mill, would that have been in law a valid promise. I concur in the opinion that it would not. A consideration is an essential ingredient to the legal existence of every simple contract. This consideration consists, as defined by Mr. Smith, in his Treatise on Contracts, page 87, to be 'any benefit to the person making the promise, or any loss, trouble or inconvenience to, or charge upon, the person to whom it is made.' The case states that the one hundred dollars originally promised had been paid by the defendant, and the controversy is for the fifty dollars under the alleged promise. What loss, trouble, or inconvenience, or charge resulted to the plaintiff by his executing the work? He was bound to build the mill by his original contract, and he was to do and did nothing more. What benefit was to result to the defendant by the promise to pay the additional fifty dollars? None whatever. He was to receive from the plaintiff precisely the same quantum of work without it as with it. The promise, therefore, if made, was purely a *nudum pactum*, not binding in law, however it may be so in honor and conscience." See, also, *Proctor v. Kent*, 12 B. Mon., 252; *Overden v. Wiley*, 30 Ala., 709; *Jones v. Miller*, 12 Mo., 408; *Laidlow v. Hatch*, 75 Ills., 11; *Owen v. Stevens*, 78 Ills., 462.

It is fully apparent from these authorities that no considera-

tion of advantage to the defendant existed in this case, and that the consideration upon which the jury based the defendant's promise will not support that promise.

II. We have seen that the consideration which the jury found existed will not support the defendant's promise. If we look for a consideration growing out of any loss or disadvantage incurred by Queally & Bro., we will find it equally wanting. The evidence does not show any express agreement of Queally & Bro., or of the surviving member of the firm, to do anything. The most that can be inferred from the evidence is that the surviving member of the firm impliedly agreed to go on with the work, and perform it in the manner and under the terms provided in the original agreement. In assuming to do this he undertook no more than he was under obligation to perform before.

III. We are equally unable to find any consideration for the promise growing out of any prejudice or disadvantage to the creditors of Queally & Bro., the plaintiff in this suit and his assignors. Nearly all of their claims arose before the defendant's promise was made. As to that portion of these demands there can be no pretense that they changed their situation or sustained any prejudice because of defendant's promise. As to the very inconsiderable portion of the claims which arose after defendant's promise, it does not appear that credit was extended in any manner different from what it was given before. In fact in almost every instance it appears that credit was given solely to the person to whom, or on whose order, the sale was made. It follows from what has been said that the court erred in giving the fifth instruction, that the general verdict for plaintiff is in conflict with the twelfth instruction given, and that the consideration on which the jury found the defendant's promise was made does not support the promise.

The foregoing considerations are decisive of the case. It is unnecessary to consider the second question so ably discussed by counsel, namely, is the promise of the defendant, though resting upon sufficient consideration, void under the statute

of frauds, because not in writing? The judgment of the court below is

REVERSED.

SEEVERS, J., having been of counsel, took no part in the determination of this case.

ON REHEARING.

ROTHROCK, J.—In the foregoing opinion it is assumed that the surviving member of the firm of Queally & Bro. was legally bound to complete the contract, notwithstanding the death of the other member of the firm. The question as to the correctness of this proposition was not presented in the original submission. A petition for rehearing was filed which was mainly devoted to this question, and a re-argument was ordered. Counsel have discussed the question elaborately and with much force, and many adjudicated cases have been cited which discuss the effect of the death of one of several partners upon the existing contracts of the partnership. Other arguments are also advanced by counsel for appellee as reasons why the judgment should be affirmed. We are content with the conclusion reached in the opinion, and with the grounds thereof, and passing all other consideration will briefly discuss the principal propositions which are argued on the rehearing.

The death of one member of a partnership works a dissolution of the firm. But the partners are jointly and severally liable for the performance of the partnership contracts, and any one or all of the partners may be sued upon a contract made by the firm. Code, section 2553. In Pars. on Partnership, 2d ed., page 409, it is said: "No dissolution of any kind affects the rights of third persons, who have had dealings with the partnership, without their consent. This is a universal rule without any exception whatever." It is true, the surviving partner cannot continue the partnership business—that is, he cannot make new engagements and contracts, and bind the personal representatives of the deceased partner, but the survivor may, and he is bound to perform the contracts entered into before the

*margin note: 3. ——: partnership: death of partner.*

death of his co-partner. It is his right and duty to perform and fulfill existing contracts, and to wind up the partnership There is, it is true, a class of cases that hold that when a contract requires peculiar skill, or the actual personal services of the contracting party, the contract terminates with the death of the party bound to render such personal service or exercise such peculiar skill. Of this class of cases are contracts for personal labor, or for publishing a book, editing a newspaper and the like. *Jening v. Lyon*, 39 Wis., 554; *Wolf v. Homes*, 20 N. Y., 197. In the last named case it is said (quoting from Story on Bailments) that the true rule may be considered to be "that where the contract is for personal services which none but the promisor can perform, then inevitable accident, or the act of God, will excuse the non-performance and enable a party to recover upon a *quantum meruit*. But where the thing to be done or the work to be performed may be done by another person, then all accidents are at the risk of the promisor."

It is argued with much earnestness and force that the death of Queally operated to determine the contract, because the performance thereof was such as to require his personal services. This cannot be admitted. It appears from the evidence that while the work was in progress he was at no time personally present, but that it was carried on by one Weed. Besides, it must be presumed that the surviving partner was competent to carry on and complete the contract. One object in contracting with a partnership is that there may be more than one person capable of carrying out and performing the undertaking, and more than one person bound for its performance. Besides the nature of the work was not such as is contemplated by the rule that a contract for personal services or the exercise of peculiar skill is terminated by the death of the party by whom the labor is to be performed, or the skill exercised.

In the case of *McCord v. West Feliciana R. R. Co.*, 3 La. An., 285, where a railway contract was let to a partnership and one member of the firm died, it was held that the death of his partner dissolved the partnership and terminated the contract. It is claimed by counsel for appellee that the case is precisely in point upon the question under discussion. But that case

was determined under the provisions of a statute of the State of Louisiana which is wholly unlike any statute in force in this State, and is not applicable here.

The foregoing propositions of law are really not controverted by counsel. They are supported by abundant authority, which we need not cite. They need only be applied to the facts in this case, and in making the application we are well satisfied that the death of Queally did not terminate the contract. Former opinion adhered to.