CORA E. MEGINNES, Appellee, v. W. J. McCHESNEY, Administrator, et al., Appellants.

**EVIDENCE:** Presumptions—Fiduciary Relations—Fraud—Consideration. Initially, the law presumes two facts, in an action on a written obligation beneficial to the one seeking to enforce it, viz.:

(1) That the transaction was just and fair and the voluntary act of the maker;

(2) That the obligation was given for a valid consideration. Defendant reverses both presumptions, *provided* he shows that, at the time of the transaction, such a fiduciary relation existed between the parties as to render it reasonably certain that they did not deal on terms of equality, and that unfair advantage in the transaction is *probable* by reason (a) of plaintiff's superior knowledge, or overmastering influence, derived from such fiduciary relation, or (b) of the maker's weakness, dependence and trust, justifiably reposed in plaintiff. So held where the nurse of a blind, aged, and decrepit man sought to enforce, against his estate, a note, given a few days before his death.

PRINCIPLE APPLIED: See No. 6.

**FRAUD:** Evidence—Fiduciary Relation—From What Circumstances Inferred. A fiduciary relation, such as to raise a presumption of fraud and a reversal of the ordinary rules of burden of proof, will not be inferred *solely* from the relation of master and servant, nor *solely* from friendship.

PRINCIPLE APPLIED: See No. 6.

**BILLS AND NOTES:** Consideration—Presumption—Non-Voluntary Act of Maker. No presumption arises that a promissory note was given for a valuable consideration, until it appears, by legal presumption, or by evidence (should the issues so require),

that the making of the note was the voluntary act of the
'maker. Sec. 3060-a24, Code Supp., 1913. So held where the
burden of proof to show consideration affirmatively was cast
upon the payee, by reason of the fiduciary relation existing
between payee and maker.

PRINCIPLE APPLIED:   See No. 6.

**BILLS AND NOTES:** Consideration—Moral Consideration—Note
4 of Maker as Gift. A promissory note, executed and delivered
by the maker to the payee, *as a gift*, even though in fulfillment
of a moral obligation, may not be enforced against the estate
of the maker. (*Harman v. Harman*, 167 Iowa, 106, overruled.)

Weaver, J., dissents.

PRINCIPLE APPLIED:   See No. 6.

**CONTRACTS:** Consideration—Moral Consideration. A moral obli-
5 gation is not a sufficient consideration for a promise.

Weaver, J., dissents.

PRINCIPLE APPLIED:   See No. 6.

**CONTRACTS:** Consideration—Performance of Services—Payments
6 to be Present Satisfaction Only. 1. An agreement to pay an *addi-
tional* compensation for services already performed, and fully
paid for in accordance with an agreement entered into prior
to such performance, even though such payment was admittedly
inadequate, is *wholly without consideration*.

2. An agreement that payments for services should be con-
sidered as a *present* satisfaction only, and that the one obli-
gated to pay should, at some other time and in some other
way, pay an additional compensation, sufficient, with such for-
mer payments, to equal the value of the services, furnishes a
valid consideration for a note given to cover such additional
compensation.

PRINCIPLE APPLIED:   A widower, at the age of 69 years,
employed a nurse to care for him and to act as his secretary
and companion. He was then living in Florida. He was nearly
blind, and later became totally so. This nurse remained in his
employ until his death, 5 years later. He suffered from rupture,
hemorrhoids, neuritis, frequently lost control of his organs of
secretion, and for 3 years prior to his death was unable to
dress himself. He required attention, night and day. There
was evidence that he depended upon this nurse for everything
and followed her directions implicitly; that she wrote his let-
ters, read to him, accompanied him on daily walks, cared for
him, cashed his drafts, paid his expenses, and gave him what-

ever, money he needed. On the other hand, there was evidence that he controlled all his business affairs, and that the nurse, as to such matters, only acted as his amanuensis. He had an income of some $2,400 per year, derived from the rental of houses and interest on negotiable paper. All his property was in Iowa, but the last years of his life were spent in California, and the property was rented by Iowa agents. From the beginning of her employment, the nurse received $50 per month and expenses. After 8 months, a written contract was executed, providing for the same compensation up to May 1, 1909, a period of 6 months. After this last date, nothing seems to have been done towards renewing the contract; and, until the old man's death, 4 years later, the nurse continued to receive the same compensation, and receipted in full up to his death, for her services. 3 weeks before his death, the old man gave the nurse his note for $5,000, payable in 6 months. There was evidence that prior to his death he stated to callers on several occasions that the $50 and expenses was inadequate pay for the services which the nurse was rendering, and that he had often so told her. To some of these callers, he spoke of the different ways in which he proposed "to make the matter right," and to others, that he had "fixed" it, and that he had given her a note, and how he proposed to pay the note. The payee filed the claim against the estate.

1. *Held:* (a) That a jury question was presented whether the fiduciary relation was such that claimant exercised a dominating influence over the old man; and (b) that, if she did exercise such influence, she must affirmatively prove (1) a valid consideration for the note; and (2) that the note was not executed in consequence of any undue influence by her, but was just, fair, and the voluntary act of the maker.

2. *Held,* presumptively, she had been fully paid for her services.

3. *Held* that, if the note was given to claimant *as a gift,*—that is, to pay her an additional sum for services already performed and *fully paid for,*—it was without consideration and unenforceable.

4. *Held* that, if the payments of $50 and expenses were made under a mutual understanding that they were to act as *present* satisfaction only, and that he would in some other way pay her an additional amount, sufficient, with such former payments, to equal the full value of the services, and if the note was given to fulfill such understanding, then the note was supported by a valid consideration,

**MASTER AND SERVANT:** Services and Compensation—Payment
7   and Receipt—Presumption. One who, after the expiration of
a written contract for services, continues to receive the same
wages as formerly received under the contract, and receipts
for such wages in full, is presumed to have received full satis-
faction for such services; but the presumption is rebuttable.

PRINCIPLE APPLIED: See No. 6.

**EVIDENCE:** Admissions—Admissions by Attorney—Scope of Em-
8   ployment. Admissions of an attorney at law, within the scope
to his employment, are, if relevant and material, admissible
against the client. So held where an attorney, employed to
collect a note, wrote a letter to the executor of the estate, and
stated that the note was a *gift* from the deceased to the payee.

**EVIDENCE:** Best and Secondary—Sufficiency of Search for Primary
9   Evidence—Papers of Deceased. An unsuccessful search through
the papers of a deceased for a paper belonging to and in the
possession of the deceased during his lifetime, without demand
for its production from others, who would have no occasion, or
right, to its possession, lays sufficient foundation for secondary
evidence.

*Appeal from Johnson District Court.*—R. P. HOWELL,
Judge.

FRIDAY, NOVEMBER 24, 1916.

REHEARING DENIED MONDAY, MARCH 12, 1917.

CORA E. Meginnes filed a claim for amount alleged due
on a note given to her by decedent shortly before his death.
Trial resulted in a judgment as prayed. The executrix
and the administrator with the will annexed appeal.—
*Reversed.*

*Dawley, Jordan & Dawley,* and *Henry G. Walker,* for
appellants.

*Dutcher & Davis* and *George D. Koser,* for appellee.

LADD, J.—I. D. L. Houser died in Los
1. EVIDENCE: pre-   Angeles, California, July 17, 1913, when
sumptions:
fiduciary rela-   nearly 74 years of age, leaving him surviv-
tions: fraud:
considera-   ing a son and two daughters. On June 24th
tion.
prior to his death, he gave claimant a prom-

issory note for $5,000, payable six months after date, with interest at the rate of 6 per cent per annum. Claim for the amount due thereon was filed October 1st of the same year, and trial thereof had in November, 1914. The defenses interposed were that the note was obtained by undue influence exerted by the payee, and was without consideration. Decedent ceased to do business about 1902, and his wife died in 1904. In March, 1908, while in Jacksonville, Florida, he employed claimant, who was a nurse, to care for him, as he was nearly blind, and suffering from other infirmities; and she continued as nurse, companion and secretary until his death, throughout the entire time receiving $50 per month and expenses, for her services. Prior to death, he became totally blind, suffered from a rupture, hemorrhoids and neuritis, and frequently lost control of his organs of excretion. He was unable to dress himself after May, 1910, and required attention day and night. That claimant proved entirely trustworthy and rendered most efficient service, this record bears indubitable evidence. Being blind, he depended on her for practically everything. She wrote letters for and read to him, accompanied him on his daily walks, and waited on him generally, as she was employed to do. All his property was at Iowa City, consisting of houses, which were rented, some bank stock, a certificate of deposit and a note. His son looked after renting the houses until the last year, and after that, this was done by a bank. His letters concerning these matters were dictated to her, and she signed his name thereto, adding "per C. E. M." His income, including a pension, was about $200 per month, which he obtained through the bank at Iowa City, and she cashed the drafts, received and paid from the proceeds his expenses, handing to him an amount necessary for personal items. Some of the witnesses testified that he relied entirely on her, and followed her directions implicitly. On the other hand, there was evidence

tending to show that he controlled all his business affairs, and that she acted merely as his amanuensis. The record fairly raised the issue as to whether, in their relations, she exercised a dominating influence over him. The mere proof of some relationships warrants the inference that the stronger or superior party obtaining a benefit or advantage succeeded in doing so through the other's confidence, and the burden is cast on the other to establish the fair-. ness and equity of the transaction. These are where the relations are such as that one person is put in the power of the other, and the law raises the presumption that any deal between them is through the dictation of the one in a situation to exercise dominion over the other. Illustrations thereof are: (1) Trustee and *cestui que trust*, dealing in reference to the trust fund; (2) attorney and client, in respect to the matter wherein the relationship exists; (3) guardian and ward, immediately after the ward arrives at age; (4) when one is the general agent of another, and has entire management, so as to be, in effect, as much his guardian as the regularly appointed guardian of an infant. The list need not be completed. Presumptions so arising are rebuttable, however. Other relationships depend on additional proof of facts and circumstances from which the existence of special confidence of one person in another is shown to be reposed to such an extent as that control by the latter is to be inferred. This may happen through relationship of blood, business, friendship or association in which the parties repose special trust and confidence in each other, and are in positions to have and exercise influence over each other. *Curtis v. Armagast*, 158 Iowa 507, 520. The rule is well stated in *Cowee v. Cornell*, 75 N. Y. 91, 99:

"It may be stated as universally true that fraud vitiates all contracts, but as a general thing it is not presumed but must be proved by the party seeking to relieve himself from

an obligation on that ground. Whenever, however, the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that, either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from overmastering influence, or, on the other, from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary, and well understood."

See *Zimmerman v. Bitner*, (Md.) 28 Atl. 820; *Dawson v. National Life Ins. Co.*, 176 Iowa 362.

2. FRAUD: evidence: fiduciary relation: from what circumstances inferred.

The existence of a fiduciary relation is not to be inferred from the relation of master and servant alone. *Nichols v. McCarthy*, 53 Conn. 299 (55 Am. R. 105). Indeed, the employee is in a position exacting obedience rather than domination. Nor will it be inferred from friendship, though that is often an important consideration, and undoubtedly furnishes a vantage ground; for one is not likely to expect a friend to deceive him into a bad bargain. As against a friend, no shield is worn nor sword drawn in defense. Friendship tends to disarm. Hypocrisy is not so common in that relation, however, as to have led the courts to declare deals between friends open to suspicion on this ground alone. *Wells v. Houston*, (Tex.) 69 S. W. 183.; *Seward v. Seward*, (Kan.) 53 Pac. 63. The evidence was such that it was for the jury to say whether decedent was under the dominion or paramount influence of plaintiff. As persons are presumed to act on their own initiative, the burden was on defendants to prove by a preponderance of evidence that decedent was so under claimant's influence. If he

was not, then the note was presumed to have been given for a valid consideration, and this must have been overcome by the defendants. *In re Chismore's Estate,* 175 Iowa 495. If he was under such dominion or influence, then the burden was on plaintiff to prove that the note was not executed in consequence of any undue influence of claimant.

3. BILLS AND NOTES : consideration: presumption: non-voluntary act of maker:

As bearing thereon, all the circumstances of its execution, for what given, the nature and amount of the consideration, may be shown; and, until proven by a preponderance of the evidence to have been the voluntary act of decedent, no presumption that it was given for a valuable consideration obtains. If not his voluntary act, the promissory note was not his, and therefore this conclusion is not in conflict with Section 3060-a24, Supplement to the Code, 1913, declaring that "every negotiable instrument is deemed *prima facie* to have been issued for a valuable consideration, and every person whose signature appears thereon to have become a party thereto for value." This presumption is overcome by the finding that the maker was under the dominion of another, and, in ascertaining whether the note was the result of the undue influence of such other or was the voluntary act of the maker, such presumption is not to be taken into account, and the jury might well have been so advised. See. *In re Workman's Estate,* 174 Iowa 222. If found to be the voluntary act of decedent, the note was thereupon presumed to have been given for a valuable consideration, and the burden was then on defendants to prove the contrary.

4. BILLS AND NOTES : consideration: moral consideration: note of maker as gift.

II. Another question involved on the trial was whether a promissory note, if executed as a gift, should be allowed by the executors. Some early decisions in New York seem so to hold. *Wright v. Wright,* 1 Cowen (N. Y.) 598; *Coutant v. Schuyler,* 1 Paige (N. Y.)

315.  But these were overruled by the court of appeals in *Harris v. Clark*, 3 N. Y. 93, which was subsequently approved in *Whitaker v. Whitaker*, 52 N. Y. 368 (11 Am. R. 711).  In *Tate v. Hilbert*, 2 Vesey Jr. 111, a desire that the law might be so construed was expressed by the Chancellor (Lord Loughborough).  *Seton v. Seton*, 2 Bro. Ch. 476, does not decide the point.  In *Dawson v. Kearton*, 3 Smale .& G. 186, decedent gave a note to one Welch for the benefit of a friend's child named Bull, and had paid interest thereon, as had the executor; and the court seems to have upheld the allowance of the claim, on the theory that the execution of the renewal note was based on a sufficient consideration, i. e., the surrender of the note renewed.  The numerous English decisions deciding that the note of a donor made to the donee as a gift cannot be enforced by the latter against the estate of the former, will be found in the briefs preceding the opinion. See also *Gosling v. Gosling*, 3 Drew 335, and *Holliday v. Atkinson*, 5 Barn. & Cress. 501.  Practically all the authorities construe such a note to be merely a promise to make a gift, and declare that such promise is revoked by the promisor's death, whether the proposed gift be *inter vivos* or *causa mortis*.  *Parish v. Stone*, 14 Pick. (Mass.) 198; *Harris v. Clark*, 3 N. Y. 93; *Blanchard v. Williamson*, 70 Ill. 647, 652; *Smith v. Administrators of Smith*, 30 N. J. Eq. 564; *Starr v. Starr*, 9 Ohio St. 74; *Smith v. Kittridge*, 21 Vt. 238; *Holley v. Adams*, 16 Vt. 206 (42 Am. D. 508) ; *Flint v. Pattee*, 33 N. H. 520 (66 Am. D. 742) ; *Hall v. Howard's Admrs.*, (S. C.) 33 Am. D. 115; *In re Kern's Estate*, 171 Pa. St. 55 (33 Atl. 129) ; *Shugart v. Shugart*, 111 Tenn. 179 (102 Am. St. 777) ; *Brown v. Moore*, 40 Tenn. 671; *Raymond v. Sellick*, 10 Conn. 479; *Richardson v. Richardson*, 148 Ill. 563 (26 L. R. A. 305 and cases collected in note).  See also collection of decisions in note to *Foxworthy, Administratrix, v. Adams*, (Ky.) 27 L. R. A. (N. S.) 308; 20 Cyc. 1214;

1 Daniel on Neg. Inst. (6th Ed.) Sec. 180; Thornton on Gifts, Section 302 *et seq.* The ground of these decisions is well stated in *Harris v. Clark,* 3 N. Y. 93:

"Gifts, however, are valid without consideration or actual value paid in return. But there must be delivery of possession. The contract must have been executed. The thing given must be put into the hands of the donee or placed within his power by delivery of the means of obtaining it. The gift of the maker's own note is the delivery of a promise only, and not of the thing promised, and the gift therefore fails. Without delivery, the transaction is not valid as an executed gift; and without consideration it is not valid as a contract to be executed."

The subject was fully considered by Chief Justice Shaw in *Parish v. Stone,* 14 Pick. (Mass.) 198:

"It has therefore been the established rule of law, that, in a suit upon a promissory note, against the promisor by the promisee, or by an indorsee, without value given, or taking the note under such circumstances as to enable him to stand only upon the rights of the promisee, it is competent for the promisor to show by way of defence, that the promise was gratuitous, and was made without any legal consideration. * * * Such being the clear rule of law, it follows that a contract to pay money, founded upon no other consideration than that of equalizing the distribution of one's estate, after his decease, is merely gratuitous; it is *nudum pactum,* given upon no sufficient legal consideration, and therefore cannot support an action or found a legal claim. The rule being clear and well settled by authorities, it is not necessary to support it by a reference to the principle upon which it is founded. But as it appears sometimes to operate harshly and to defeat the intentions of those who have a right to dispose of property as they please, it may afford some satisfaction to consider the importance of making and preserving a broad distinction between the claims of

legatees and others, who rest their claims upon the bounty of the testator, and creditors who have demands upon his justice, which are in their nature paramount. The law in a variety of ways, and upon the most satisfactory grounds, secures to creditors a preference. Indeed, a holder of property, dying, can hardly be said to be the owner, beyond the balance which will remain after satisfying the demands of creditors. But if the holder of a gratuitous note can set it up as a legal claim, it would be extremely difficult to apply the rules of the law to his case, which are made for the purpose of preserving the distinction between volunteers and creditors. He would claim as a creditor, upon his contract; and if such a promise is allowed to have the character and effect of a contract, it is difficult to perceive upon what ground such a promisee could be prevented from recovering, either at law or before commissioners of insolvency, and coming in upon an equal footing with other creditors. And as to the circumstance that, in a particular case, the intent of the owner of property may be defeated, it seems to be a perfect answer that an owner of property has only to put his intent in the form of a bequest, and it will be carried into effect, as far as it can be, consistently with the paramount claims of creditors and others, founding their claims upon legal contracts. To permit a bequest or voluntary gift to be made in the form of a binding and obligatory contract, conferring as they do, very different rights, and calling for different remedies, will seldom be resorted to for any useful or proper purpose, and would tend to a confusion and uncertainty of rights, extremely inconvenient in practice."

And later on, with reference to *donatio causa mortis*:

"We think the donor's own promissory note payable to the donee, could not be the subject of such a donation. It was not an existing available promissory note to anyone; it was not a chose in action. We have already seen that it was not a binding contract by the promisor to the

promisee; and if it were, it would be open to another objection as a *donatio causa mortis,* namely, that it would not be revocable by the donor. It was simply a promise to pay money, and as such and as a gift of a sum of money, it wants the essential requisite of an actual delivery."

The note executed by decedent, if gratuitous, was a mere promise to give money at a future time. He might, if living, have defended on the ground that it was without consideration, and since he is dead, his representatives may interpose the same defense. He did not deliver the money promised before death, and, as there was no actual delivery of gift, if such it was, before his death, the note, if gratuitous, cannot be enforced. In so far as anything said in *Harman v. Harman,* 167 Iowa 106, is in conflict herewith, that case must be regarded as overruled.

III. The court rightly ruled that the

**5. CONTRACTS: consideration: moral consideration.** mere fact that decedent felt under obligation to pay claimant, owing to a supposed inadequacy of the compensation previously paid in pursuance of an agreement, would furnish no consideration for a note. At most, this was but a moral obligation, and, as such, was not a sufficient consideration. Such has been the holding of this court since *Nightingale v. Barney,* 4 G. Greene 106, where Greene, J., speaking for the court said:

"As the doctrine now prevails, something more than a mere moral obligation is necessary to create a good foundation for an action between the parties thereto. There must be a consideration esteemed valuable at law, before an express promise can create or revive a legal liability. In Story on Promissory Notes, Sec. 185, we are expressly informed that 'a mere moral obligation, although coupled with an express promise, is not a sufficient consideration to support a note between the same parties.'"

This doctrine was recognized as late as *Daily v. Minnick*, 117 Iowa 563, where we said, speaking through Deemer, J.:

"It is quite generally held that a mere moral obligation is not sufficient consideration to support a subsequent promise."

Some of the early English cases lend support to the proposition that a moral obligation is sufficient support for an express promise. See *Atkins v. Hill*, 1 Cowp. 284; *Atkins v. Banwell*, 2 East 505. This view seems to have been first challenged and overthrown in a note to *Wennall v. Adney*, 3 Bos. & P. 247, 252, where many decisions are reviewed, and the doctrine laid down, generally followed since, that:

"An express promise, therefore, as it should seem, can only revive a precedent good consideration, which might have been enforced at law through the medium of an implied promise, had it not been suspended by some positive rule of law, but can give no original right of action if the obligation on which it is founded never could have been enforced at law, though not barred by any legal maxim or statute provision."

In *Kenan v. Holloway*, 16 Ala. 53 (50 Am. D. 162), the court observed that the law cannot undertake to enforce every promise which a man of honor and dignity would feel himself bound to perform; and, in *Cook v. Bradley*, 7 Conn. 57 (18 Am. D. 79), doubt is expressed whether any case is to be found in the books where a moral obligation alone was held sufficient consideration for an express promise. See also, as holding a moral obligation only an insufficient consideration, *Schnell v. Nell*, 17 Ind. 29 (79 Am. D. 453), *Farnham v. O'Brien*, 22 Me. 475, *Mills v. Wyman*, 3 Pick. (Mass.) 207, where it is said there must be some pre-existing obligation which has become inoperative by positive law, to form an effective promise. *Hendricks v. Robinson*, 56 Miss. 694 (31 Am. R. 382) ; *Shepard v. Rhodes*, 7 R. I. 470

(84 Am. D. 573) ; *Linz v. Schuck,* 106 Md. 220 (11 L. R. A. [N. S.] 789, 124 Am. St. 481, 14 A. & E. Ann. Cas. 495).

Without further citation, it is enough to say that this is now the doctrine obtaining in England and nearly all the courts of this country, though occasionally criticised, as in *Ferguson v. Harris,* 39 S. C. 323 (17 S. E. 782). This doctrine was applied in *Allen v. Bryson,* 67 Iowa 591, in holding that services gratuitously rendered will not support a promise to pay therefor. The same rule prevailed where a father promised to pay for the services of a daughter, who had attained majority, previously rendered as member of his family. See also *Chadwick v. Devore,* 69 Iowa 637; *Van Sandt v. Cramer,* 60 Iowa 424. Nor is a subsequent promise to do something not required by a previous contract, without a new consideration, binding.

6. CONTRACTS: consideration: performance of services: payments to be present satisfaction only.

*Handrahan v. O'Regan,* 45 Iowa 298. The doing of that which a party is already under contractual obligation to do, will not support a further promise to pay an additional price. *Ayres v. Chicago, R. I. & P. R. Co.,* 52 Iowa 478; *Runkle v. Kettering,* 127 Iowa 6. In *Stilk v. Myrick,* 2 Campb. 317, Lord Ellenborough held that an agreement to pay seamen extra for what they were bound by their articles to do was void; and a like ruling was made in *Bartlett v. Wyman,* 14 Johns. (N. Y.) 260, where a master agreed to give more wages if the seamen would not abandon the ship. In *Davis & Co. v. Morgan,* (Ga.) 61 L. R. A. 148, defendant had engaged to work for plaintiff a year at $40 per month. Some time after he had begun work, he was offered $65 per month by a company in Florida, and claimed that, on advising his employer of this, he was promised $10 per month additional compensation. This promise was held to have been without consideration. The cases are collected in 1 Elliott on Contracts, Sec. 211 *et seq.* The principle controlling these cases necessarily leads to the conclusion

that, after a contract is fully performed by the parties, a promise to pay an additional sum cannot be enforced. See *Trimble v. Rudy*, (Ky.) 53 L. R. A. 353, *Muir v. Kane*, (Wash.) 26 L. R. A. (N. S.) 519.

In *Bentley v. Lamb*, 112 Pa. St. 480 (56 Am. R. 330), there was no showing that the compensation had been in full for services rendered, and therefore the promise to pay an additional amount could not be said to have been without consideration. See *Appeal of Clark*, (Conn.) 19 Atl. 332. In *Barthe v. Succession of Lacroix*, 29 La. Ann. 326 (29 Am. R. 330), however, the claimant had worked for decedent for low wages, which had been paid, and a note to make up what the maker deemed the inadequacy was held to be with consideration, the court saying:

"The conclusion we have reached is that the deceased, Lacroix, being without family, and believing that plaintiff had served him long and faithfully at very small wages, felt that he was under a moral obligation to remunerate him beyond his wages, and executed this five-hundred-dollar note for that purpose. In one sense it was a gratuity; i. e., he was under no legal obligation to do so. In another sense it was the fulfillment of a natural obligation. We think that there was a good and valid consideration for the note."

In other words, the court declared the moral obligation a sufficient consideration. To that, as seen, we could not subscribe without repudiating former decisions. Anything less than a legal obligation, as defined in *Wennall v. Adncy*, supra, cannot be regarded as a sufficient consideration. In the case at bar, the evidence tended to show that claimant engaged to render services required of her for the compensation actually paid, for which she receipted in full. A promise to pay an additional sum, therefore, was as much without consideration as the agreement to pay more than the contract price, in *Ayres v. Chicago, R. I. & P. R. Co.*, supra. That her compensation may have been inadequate can

make no difference. Surely she could not have established a claim for the amount of the inadequacy against the estate. If so, and the court so held in *Voorhees v. Combs,* 33 N. J. L. 494, it would not furnish a legal consideration for a promissory note given therefor. Any agreement to pay for services already rendered and fully paid for, is utterly without consideration.

7. MASTER AND SERVANT: services and compensation: payment and receipt: presumption.

IV. From the circumstances that claimant entered into a written contract specifying the precise sum she should be paid monthly until May, 1909, and receipted for such sum as salary in full each month up to the time of decedent's death, and for the last month thereafter, a strong inference arose that she had received all that was owing her; but such inference is not conclusive. Notwithstanding this, it was open to her to show that she was induced to continue in his employment on a mutual understanding that these payments were present satisfaction for such wages as she was to receive in money, and that he would later on make up and pay in some manner for the difference between what he was giving her and the real value of her services rendered subsequent to such understanding. Of course, until there was such an understanding, if ever there was, there could be no valid claim against the estate. Services rendered subsequent to such an understanding and in pursuance thereof would constitute a valuable consideration for a promise to pay her, such as contained in the note given her. The evidence was such as to carry this issue to the jury. There was evidence tending to show that the note was made as a gift, and other evidence tending to prove that it was executed for a valuable consideration. It appeared that decedent paid claimant wages at the rate of $50 and expenses per month up to the time of his death. In November, 1908, a written contract was entered into, reciting her employment up to May

1, 1909. Though this does not appear to have been extended in writing, or another written agreement to have been executed, she did receipt payment for salary in full to decedent each month. But he said to several witnesses, shortly before his death, that he had not been paying her enough and that he would make the matter right by paying her more. Thus Dr. Hitt, his attending physician, testified that decedent, in talking about additional help, said "he didn't feel he had paid her sufficient;" that he intended to "make that right by giving her a note;" that he "did not feel he had paid Cora what was due her for all her atten-tion to him."

Furst, who visited him frequently, but not as a physician, when told by him what he was paying claimant, suggested that it was not enough, and he responded that "he knew it wasn't, and was going to provide for her in another way."

Mills testified that, in response to the statement by him that if he kept her up all night he ought to pay double wages, he said: "I realize that Cora is not receiving as much as she ought to," and that this had been so for some time; and added, "I have fixed that now so that she will be properly paid in the near future;" and explained that he had no ready money, but had property in the east, which he expected to turn into cash; and that, in the meantime, he had given claimant a note of $5,000, which he intended to pay as soon as he could turn some of his property into cash; and that the note had been given probably two weeks prior to that time. This is said to have occurred July 3d prior to his death.

Elizabeth Spurgeon testified to having a conversation with him, in which he proposed building claimant a house, saying that "he did not pay her enough money," and that they would live in the house and when he was gone she would have it for a home, to pay her for lack of wages; and

explained that he had not paid her because of being short of money; that "he often told her that he felt as though he had not been paying her enough compensation, and that he felt it his duty to compensate her more, that he expected to give her something in the future." To Burns, he related what she had done for him, and remarked that he expected "to recompense her for her services, * * * to do the right thing by her." Mickle swore that he entered the sitting room of defendant, the day the note was executed; that the wind had blown all the papers to the floor, one of which was the note in suit; and that, when he handed it to decedent, the latter remarked that it was to claimant, saying that she had been a good servant to him, that the note of $5,000 was for the work she had done for him, and that he was going to sell one of his buildings to pay it.

From the circumstances that claimant entered into a written contract specifying the precise sum she should be paid monthly until May, 1909, and receipted for such sum as salary in full each month up to the time of decedent's death, and for the last month thereafter, a strong inference arose that she had received all that was owing her, but such inference, as said, is not conclusive. Notwithstanding this, it was open to her to show that she was induced to continue in his employment on a mutual understanding that these payments were present satisfaction for such wages as she was to receive in money, and that he would, later on, make up and pay in some manner for the difference between what he was giving her and the real value of her services rendered subsequent to such understanding. Of course, until there was such an understanding, if any there was, she had no claim against the estate. Services rendered subsequent to such an understanding, and in pursuance thereof, would constitute a valuable consideration for a promise to pay her, such as contained in the note given her. It was for the jury to say whether the note was made

as a gift, or in compensation for services rendered in pursuance of an understanding that she should be paid in addition to her monthly stipend.

V. Koser, one of the attorneys for claimant, received the note for collection shortly after decedent's death. On the 11th of November, 1913, he addressed a letter to the executor, saying, in substance, that he was enclosing a copy of an affidavit of one Frontman, and that claimant said she could procure a number of them proving the note to be genuine, and "that it was the intention of your father to make her a gift of this money." He urged settlement. The affidavit of Frontman was that decedent had told him that he had made a note to her for $5,000, and that she should have this money for a Christmas gift. This letter was excluded from evidence, on the objection that it was incompetent, immaterial and irrelevant, and not binding on claimant or in any manner affecting her right to recover. The ruling was erroneous. *McRea v. Insurance Bank of Columbus*, 16 Ala. 755; *Stinesville & B. Stone Co. v. White*, 65 N. Y. Supp. 609; *Tredwell v. Doncourt*, 45 N. Y. Supp. 946; *Blessing v. Dodds*, 53 Ind. 95; *Holt v. Squire*, 1 R. & M. 282; 1 Elliott on Evidence, Section 256. The attorney, in writing the letter and enclosing the affidavit, was acting within the scope of his employment, and his statements therein were admissible in evidence. *Loomis v. New York, N. H. & H. R. Co.*, 159 Mass. 39 (34 N. E. 82).

*8. EVIDENCE: admissions: admissions by attorney: scope of employment.*

VI. Copeland, who married decedent's daughter, visited him in Los Angeles, California, and testified that, while there, he saw a paper bearing claimant's signature, and that he made a memorandum of its contents, but did not have the paper. The administrator with the will annexed had testified that he had searched through

*9. EVIDENCE: best and secondary: sufficiency of search for primary evidence: papers of deceased.*

all the papers of the estate therefor, and had been unable to find it. Secondary evidence was excluded. This, we think, laid the foundation for the introduction of secondary evidence. Appellee argues that Copeland did not designate at what part of Los Angeles he saw the paper, but the evidence disclosed that it was where he visited decedent, and this was sufficiently definite. Again, it is suggested that the paper should have been demanded of claimant. A sufficient answer is that it was not a paper to which she was entitled, and the showing is sufficient if places where it would be likely to be are searched. The ruling excluding secondary evidence of its contents was erroneous.

In view of another trial, it should be added that the seventh instruction may well be more explicit as to the showing of good faith and fair dealing exacted from the claimant if her relation be found to have been fiduciary. Also, it may be well to explain to the jury that the receipts indicated on their face that claimant had been fully paid all wages owing her; and that, if she claimed otherwise, the burden was on her to show that she rendered services in pursuance of some understanding that she was to be paid a sum additional thereto. The tenth instruction might well be made more explicit by telling the jury that, if there was an understanding that she should be paid a sum in addition to the monthly wage, and the note was executed to pay for services rendered in pursuance thereof and thereafter to be rendered, this would be a sufficient consideration, even though he may have been mindful of past inadequacy of compensation in fixing the amount. Because of the errors pointed out, the judgment is—*Reversed.*

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.

WEAVER, J.—I concur in the result announced in the foregoing opinion, but cannot agree to the correctness of the discussion there indulged in upon the general subject

of whether the making and delivering of a promissory note by way of gift to the payee constitutes foundation for a valid claim against the maker's estate. I also dissent from the sweeping conclusion that a moral obligation alone is in no case a sufficient consideration for a contract.